UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| HAZARD COAL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6:20-CV-010-CHB |
| | ) | |
| v. | ) | |
| | ) | **ORDER DENYING TEMPORARY** |
| AMERICAN RESOURCES | ) | **RESTRAINING ORDER** |
| CORPORATION and PERRY COUNTY | ) | |
| RESOURCES LLC, | ) | |
| | ) | |
| Defendants. | | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Plaintiff's Motion for a Temporary Restraining Order

and Preliminary Injunction [R. 39], and Defendant's Response and Objection to Plaintiff's

Motion for Injunctive Relief [R. 41].  The Court held a Telephonic Status Conference on August

13, 2020 [R. 42], where it heard evidence and argument from counsel. For the reasons below, the

Court will deny Plaintiff's motion.

**I.    Factual Background**

This case involves a coal lease (the "Lease" or "Leasehold") between the Plaintiff,

Hazard Coal Corporation ("HCC"), the lessor, and Defendant, American Resources Corporation

and Perry County Resources ("ARC"),[1] the lessee.  ARC contends it assumed the Lease

(including all improvements on the Leasehold), formerly owned by Perry County Coal, LLC, in

a bankruptcy proceeding, *In re Cambrian Holding Co.*, No. 19-51200, 2020 BL 1676 (Bankr.

E.D. Ky. Jan. 03, 2020).  [R. 41-2, p. 3]  The underlying dispute between the parties centers on

---

[1] Perry Coal Company is a wholly owned subsidiary of American Resources Corporation. Accordingly, this Order
will refer to the entities as one company, ARC.

- 1 -

HCC's claims that ARC breached the Lease earlier this year by failing to pay the annual minimum royalty of $100,000, that ARC failed to cure the Lease, and that the Lease is therefore terminated, such that ARC has no rights to the Leasehold or any improvements on it.  [R. 39-1, pp. 5–12]  HCC also argues that ARC never succeeded to the Leasehold in the first place because ARC committed fraud on the Bankruptcy Court when it acquired the Lease even though it was "permit blocked."  [R. 39-1, pp. 9–11]  Unsurprisingly, ARC counters that it is the lawful owner of the Leasehold, including all Improvements (as defined below), and that it was only obligated to pay $50,000 as the annual minimum royalty because — per the terms of the Lease — the coal reserves have been depleted, decreasing the required minimum royalty.  [R. 41-2, p. 3; TSC[2]]

The land subject to the Lease is part of a larger mining area in Perry County, Kentucky called the E4-2 Mine, which has additional coal reserves.  [R. 39-3, ¶¶ 6–7]  The Leasehold has a number of improvements, including a coal washing/preparation facility ("prep plant"), two coal loadout facilities, a radial coal stacker, and a synfuel plant (all of which are collectively referred to herein as the "Improvements").  [R. 39-1, p. 2]  HCC claims that the Improvements add significant value to the Leasehold.  *Id.* at 12.

Earlier this year, HCC requested a temporary restraining order (TRO) to prohibit ARC from, among other things, entering the Leasehold.  [R. 1-1, ¶ 42]  That motion was withdrawn. [R. 12]  Now, HCC moves for a TRO to prohibit ARC from removing the Improvements on the Leasehold, including the prep plant, loadout facility, synfuel plant, and radial stacker.  [R. 39-1, p. 3]  HCC argues that it will suffer irreparable harm if ARC is allowed to remove the Improvements, which have been used to process coal from the Leasehold as well as from other mines in the vicinity.  *Id.*

---

[2] Citations to "TSC" refer to the Telephonic Status Conference the Court held on August 13, 2010.

In its Response to the TRO, ARC clarified that it has no plans to remove any of the operational Improvements from the Leasehold (the prep plant, loadout facility, or other processing Improvements).  [R. 41-1, ¶ 11; R. 41-2, p. 2]  Rather, ARC previously dismantled the radial stacker and planned to dismantle the synfuel plant, hoping to sell both for the scrap value of the metal.  [R. 41-1, ¶¶ 7–9; TSC]  ARC argues that neither the radial stacker nor the synfuel plant add to the functionality of the Leasehold.  [R. 41-1, ¶ 4; TSC]  It claims (and Plaintiff does not refute) that the radial stacker has not been used since 2004, and the synfuel plant has not been used in 15 years because the tax credits that subsidized its operations expired long ago.  [R. 41-1, ¶¶ 7–9]  ARC claims that both facilities — the stacker and the prep plant — have become safety and environmental hazards because of non-use and neglect.  *Id.* at ¶¶ 7–10.

HCC claims that the Improvements are "an integral part of the E4-2 Mine" because they benefit HCC's lands as well as other mineral estates which "may use the facilities to process/handle coal."  [R. 39-1, p. 12]  Notwithstanding ARC's agreement not to remove any operational Improvements from the Leasehold, HCC nevertheless maintains that the long-defunct stacker and synfuel plant add value to the Leasehold and could perhaps be "repurposed." [TSC]  HCC further claims that it will suffer irreparable harm if these Improvements are removed because ARC's financial status is "questionable," casting doubt on whether any money judgment by HCC would be collectible.  [R. 39-1, pp. 12–13]  HCC asks this Court to enter a TRO preventing ARC from removing the synfuel plant and the dismantled stacker.

## II.   Discussion

In determining whether to grant a temporary restraining order, the Court considers the same four factors applicable to a motion for preliminary injunction: (1) the movant's likelihood of success on the merits; (2) whether the movant "would likely be permanently harmed absent

the injunction; (3) whether the injunction would cause substantial harm to third parties; and (4) whether the injunction would serve the public interest." *McGirr v. Rehme*, 891 F.3d 603, 610 (6th Cir. 2018) (citing *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017)). Though the standard for a TRO is the same as a preliminary injunction, there is increased emphasis on irreparable harm. *ABX Air, Inc. v. Int'l Bhd. of Teamsters, Airline Div.*, 219 F. Supp. 3d 665, 670 (S.D. Ohio 2016); *see also New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 n.2 (1977).

The grant of a TRO is within the discretion of the District Court. *Am. Book Co. v. Blount*, 295 F. Supp. 1189, 1191 (E.D. Ky. 1969); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 11A *Federal Practice and Procedure* § 2951 (3d ed. 2020). "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). Having reviewed the pleadings and heard argument during the TSC, and being otherwise sufficiently advised, the Court makes the following findings:

## A. Likelihood of Success

Even assuming that HCC has shown a sufficient likelihood of success on the merits, it fails under the standard of irreparable harm. This Court need not examine the merits of the underlying action with a fine-tooth comb: HCC must simply show that it has a "reasonable probability that it will prevail on the merits." *Trefelner ex rel. Trefelner v. Burrell Sch. Dist.*, 655 F. Supp. 2d 581, 589 (W.D. Pa. 2009) (quoting *Oburn v. Shapp*, 521 F.2d 142, 148 (3d Cir. 1975)); *see also Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 527 (6th Cir. 2017)

("As long as there is some likelihood of success on the merits, these factors are to be balanced, rather than tallied.").

Here, HCC has presented three arguments for why ARC is in breach of the Lease: ARC breached the Lease by failing to pay the required annual minimum royalty of $100,000; ARC was not properly assigned the Lease from the Bankruptcy Court; and ARC committed fraud on the Bankruptcy Court by assuming the Lease even though it was "permit blocked" in violation of the representations ARC made to the Bankruptcy Court when it acquired the Lease.  [R. 39-1, pp. 4–11]  ARC, on the other hand, contends the annual minimum royalty was only $50,000 because the coal reserves have been depleted, and it further contends that it is the rightful owner of the Improvements, having properly assumed the Lease in the bankruptcy proceedings.  [R. 41-1, p. 3; TSC]

HCC has advanced a colorable claim on the merits, but even assuming HCC has met this prong, it fails to satisfy the irreparable harm prong, as explained below.

**B. Irreparable Harm**

The most important factor in an application for a TRO is the movant's showing of irreparable harm.  *ABX Air*, 219 F. Supp. 3d at 670; 11A *Federal Practice and Procedure*, *supra*, § 2951. A showing of irreparable harm is a necessary element of a TRO.  *Cf. D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019) (noting in the context of a preliminary injunction that "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement" (internal quotation marks omitted)).

To show irreparable harm, a movant must show that, without a TRO, its interests would be damaged in ways that could not be remedied later on in the legal process.  *S. Glazer's Distributors*, 860 F.3d at 852.  Further, the movant must show that the irreparable harm is

"likely," not merely speculative.  *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20–22 (2008);

*Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir.

1991) ("[T]he harm alleged must be both certain and immediate, rather than speculative or

theoretical.").  For example, irreparable harm is often at stake in cases involving trade secrets

and non-compete agreements.  *See, e.g.*, *LKQ Corp. v. Fengler*, No. 12-CV-2741, 2012 WL

1405774, at *8 (N.D. Ill. Apr. 23, 2012) (denying a TRO to enforce a noncompete agreement,

since without evidence that the employee was using trade secrets for his new company, the harm

was too speculative); *Aon Risk Servs. Cos. v. Alliant Ins. Servs., Inc.*, 415 F. Supp. 3d 843, 852

(N.D. Ill. 2019) (granting a TRO enforcing a noncompete agreement after the employer pointed

to five specific clients that left the employer's business to go to the employees' new company).

      Generally, economic loss is not considered to be irreparable, since damages can

compensate the movant.  *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373,

1382 (6th Cir. 1995).  But there are extraordinary circumstances where economic loss is

sufficient to grant a TRO, such as where the potential economic loss would threaten the moving

party's entire business.  *Id.*  For example, in *Performance Unlimited*, the Sixth Circuit granted a

TRO for a licensor's contract claim against a publisher only upon evidence that contract

payments would destroy the licensor's entire business, since the contract payments were its

single largest source of revenue — the harm had to be especially great to justify the

extraordinary remedy of a TRO.  *Id.* at 1382.

      Another narrow exception to the general rule is the clear threat of the non-movant

becoming insolvent, thus making any money judgment uncollectible.  Sean M. Berkowitz &

Brian T. Glennon, 2 *Business and Commercial Litigation in Federal Courts* § 17:23 (4th ed.);

*see Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984).  In *Teradyne,*

*Inc. v. Mostek Corp.*, 797 F.2d 43 (1st Cir. 1986), a supplier was granted a preliminary injunction

on a contract claim involving $3–4 million in potential damages by showing that the buyer was

already in the process of liquidating its assets and winding down its business. *Id.* at 53.  And in

*Deckert v. Indep. Shares Corp.*, 311 U.S. 282 (1940), the Court granted a preliminary injunction

to stockholders to prevent a transfer from a business in danger of insolvency, when there were

allegations that the business had ceased operations. *Id.* at 290.

  Here, HCC's alleged harm falls short, especially in light of ARC's agreement not to

remove any of the operational Improvements (the prep plant and loadout facilities).  First, the

thrust of HCC's alleged harm is that the Improvements are "an integral part of the E4-2 Mine."

[R. 39-1, p. 12]  That is because HCC contends that the Improvements benefit HCC's lands as

well as other mineral estates that "may use the facilities to process/handle coal." *Id.*  But HCC's

claimed injury is mooted by ARC's agreement that it will not remove any of the operational

Improvements, including the prep plant and loadout facilities.  Thus, the operational

Improvements (the ones that potentially add real value to the Leasehold and have at times

serviced adjoining mines) are not at risk of removal.

  At issue currently is the removal of the radial stacker and synfuel plant only (which have

been defunct and non-operational for over 15 years).  It was clear from the TSC and pleadings

that these non-operational Improvements do not affect the functionality of the Leasehold, nor

does their removal in any way impact HCC's current operations (or the operations of any of the

adjoining mines).  Even HCC agrees that no one has used these facilities for well over a decade.

[TSC]  Indeed, HCC admitted that the synfuel plant has little value as a synfuel plant itself

(given that the tax credits underlying the genesis of the synfuel plant have long since expired).

*Id.*  During the TSC, HCC declined to place a value on the defunct synfuel plant and was unable

to articulate any potential value it added to the Leasehold, other than speculating that it could possibly be "repurposed." [TSC]

Such speculation is hardy grounds for the issuance of a TRO. The Court notes that in the last 15-plus years while these facilities have sat idle, no one has seen fit to undertake such repurposing. Further, ARC itself is dismantling these structures (claiming they are an environmental and structural hazard due to non-use and neglect) and essentially selling them for the scrap value of the metal — another indication that they likely have little function otherwise. During the TSC, HCC posited that in a down market, lots of assets sit idle till the market changes. But that is not the situation here. The stacker and synfuel plant have been non-operational for over 15 years.

In short, the Court is not convinced that the synfuel plant is worth any more than its scrap value. Additionally, the radial stacker parts lying on the ground are scrap, almost by definition. With no viable estimate of value or ability to be "repurposed," HCC's claim of irreparable harm is not likely, but rather is only speculative. *See Mich. Coal. of Radioactive Material Users*, 945 F.2d at 154.

Given that the stacker and synfuel plant are not operational and do not appear to contribute to the value of the Leasehold, HCC's sole remaining argument for irreparable injury is its claim that money damages are insufficient due to ARC's "questionable" financial status. But again, this generalized concern is insufficient to support issuing a TRO. The Court understands HCC's concerns about possibly failing to recover any monetary judgment if HCC ultimately prevails on the merits. But its concerns, at least at this point, do not rise above the generalized concerns of many parties during a commercial dispute. Further, these concerns are likewise allayed by ARC's intention to remove only idle, non-operational Improvements, which, by all

accounts, have little value other than for scrap.  This is significant because HCC's only articulable irreparable injury at this point is its claim that ARC may become judgment-proof. Given that these Improvements do not add value to the operations of the Leasehold, the risk of this harm to HCC (that it will be unable to recover from ARC) is likewise diminished.

HCC argued (in the TSC) that the value of the Improvements is "irrelevant" because HCC "owns" the Improvements (due to ARC's breach of the Lease).  But this puts the cart before the horse.  Whether HCC or ARC owns the Improvements goes to the merits of this case, not whether HCC will suffer irreparable and immediate injury in the absence of a TRO.

The Court notes that HCC has made some showing that ARC's financial difficulties might cast doubt over its ability to recover any monetary judgment: ARC did not dispute that it had missed payments on financial obligations earlier this year (but claims it is current now) and admitted that it was undergoing financial difficulties because of the COVID-19 pandemic.  [R. 39-12, ¶ 4; TSC]  But unlike the plaintiffs in *Teradyne*, which showed that the defendant was winding up its business in a case with potential damages of $3–4 million, 797 F.2d at 53, HCC has not demonstrated the type and extent of harm necessary to move this case from the garden-variety lease dispute to one necessitating a TRO.  *Transamerica Insurance Finance Corp. v. North American Trucking Ass'n*, 937 F. Supp. 630 (W.D. Ky. 1996) is also inapposite, as that case involved an insurance claim of over $5 million.  *Id.* at 632.  HCC has not shown that ARC is in danger of insolvency, nor has it presented any evidence that ARC would disregard a judgment in this specific case.  And unlike the plaintiffs in *Teradyne* and *Deckert*, HCC has not demonstrated the significant irreparable harm necessary or that ARC is in the process of being liquidated or ceasing operation.

The speculative nature of HCC's alleged harm (given that the prep plant and loadout facilities are not at risk of removal), combined with the generalized nature of the evidence of ARC's financial picture, make it unlikely that HCC will face irreparable harm in the absence of a TRO.  And nothing in the record indicates that — despite some financial difficulty — ARC would not be able to pay back the value of scrap metal if a final judgment were rendered in HCC's favor.  Accordingly, HCC cannot succeed in showing that it will face irreparable harm.

### C.  Harm to Third Parties

The balance of equities when considering harm to third parties does not point in either direction.  ARC alleged that it would be harmed in several ways if the TRO were granted, including increased liability for regulatory penalties and environmental concerns given the current disrepair of the stacker and synfuel plant, safety concerns of workers and the public, and difficulties rescheduling the removal of the plant.  ARC could point to no evidence of regulators actually planning to inspect the synfuel plant or levy penalties imminently, and the prospect of fines in the far-off future is speculative.  [R. 41-1, ¶¶ 10–11]  Although could not show how the plant posed an immediate, short-term danger, the Court does give some credence to the proposition that after remaining idle for nearly two decades, these facilities may be (or may soon become) a hazard. [TSC]  The plant is close to a private road used by ARC's employees and others. [R. 41-1, ¶ 9; TSC]

In sum, there appears to be some potential prejudice to ARC (but not much) if the TRO were granted.  But when balanced against the speculative harm to HCC if the TRO were denied, the balance of equities does not point either way.

### D.  Public Interest

Neither party provided evidence of the TRO going with or against the public interest. The Court credits neither HCC's passing mention of the need to preserve coal jobs by maintaining access to the Improvements (especially given that the prep plant and loadout facilities will remain untouched and the non-operational structures being dismantled create no jobs), nor ARC's passing reference to its commitment to environmental concerns — neither of these are short-term concerns relevant to a TRO. Accordingly, the public interest does not point either way.

### E. Balance of Factors

Considering the four factors, the Court finds that the HCC likely met the standard for showing a colorable likelihood of success on the merits. But HCC failed to demonstrate irreparable harm. The harm to third parties and the public interest did not point either way. Because a showing of irreparable harm is the most important factor for considering a TRO, the Court holds that the balance of factors weighs in favor of denying the TRO.

### III.    Conclusion

For all of the reasons discussed above, the Court will deny the Motion for a Temporary Restraining Order and Preliminary Injunction. Accordingly, and the Court having been otherwise sufficiently advised,

IT IS HEREBY ORDERED as follows:

1.    The Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction [R. 39] is **DENIED**.

This the 18th day of August, 2020.

- 11 -

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY