UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| HAZARD COAL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6:20-CV-010-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| AMERICAN RESOURCES | ) | **AND ORDER** |
| CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on three motions filed by Plaintiff Hazard Coal

Corporation ("Hazard Coal"). First, Hazard Coal filed a Motion for Summary Judgment. [R. 44].

Defendants American Resources Corporation and its subsidiary, Perry County Resources, LLC

(collectively, "ARC" or "Defendants"), filed a response, [R. 50], and Hazard Coal replied, [R.

51].[1] Next, Hazard Coal filed a Motion to Exclude Purported Expert Testimony of Richard Dirk

Smith ("Motion to Exclude Expert Testimony"). [R. 45]. Defendants also responded to that

motion, [R. 49], and Hazard Coal replied, [R. 52].[2] Finally, Hazard Coal filed a Motion for an

Adjudication of the Lease Termination Issue in the Pending Motion for Summary Judgment and

Supporting Memoranda and to Hold the Remaining Issues in Abeyance Pending the Outcome of

the Related Appeal ("Motion for Adjudication and Stay"). [R. 65]. In that motion, Hazard Coal

requests that the Court resolve the specific lease termination issue raised in Hazard Coal's

Motion for Summary Judgment, [R. 44], but stay all other matters pending resolution of Hazard

Coal's appeal of a related Bankruptcy Court order. [R. 65]. Defendants responded, stating no

---

[1] Hazard Coal's reply has been docketed twice, at R. 51 and R. 53.
[2] Hazard Coal's reply has been docketed twice, at R. 52 and R. 54.

objection to the requested adjudication and stay. [R. 66]. For the reasons set forth below, the Court will grant the Motion for Adjudication and Stay, grant the Motion for Summary Judgment on the lease termination issue, and deny as moot the Motion to Exclude Expert Testimony. Upon entry of this Memorandum Opinion and Order, the Court will stay this matter pending resolution of the related appeal.

## I.      BACKGROUND

### A.  The Lease Agreement

On December 1, 1981, Hazard Coal, acting as lessor, and Whitaker Coal Corporation, acting as lessee, entered into a Lease Agreement ("the Lease"). [R. 44-2]. Prior lease arrangements are described in the Lease. The first lease arrangement began on July 8, 1960, when Elmer Whitaker leased "Number 4 seam of coal" from Hazard Coal. *Id.* at 1. That lease arrangement was amended multiple times, such that it included two additional seams of coal by 1978. *Id.* In the present Lease, this lease arrangement beginning on July 8, 1960 is referred to as the "Original Lease." *Id.* Eventually, Mr. Whitaker assigned the Original Lease to Whitaker Coal Corporation. *Id.* The Lease further explains that Hazard Coal, as lessor, "desires to lease to Lessee all the coal properties, coal, and seams of coal owned by Lessor and located in Perry County, Kentucky, and to incorporate all previous lease agreements between the parties into this Agreement." *Id.* at 2.

At some point, Perry County Coal, LLC ("Perry County Coal") assumed Whitaker Coal Corporation's interest in the Lease. [R. 44-3, ¶ 4]. Pursuant to the Lease, Perry County Coal was permitted to mine coal from Hazard Coal's Perry County property, as well as transport coal over that property. [R. 44-2, pp. 6–9].

As lessee, Perry County Coal was required to pay certain fees and royalties. For example, under Section 9 of the Lease, the lessee and its affiliates could transport coal mined from other properties across the leasehold, for a wheelage fee of five cents per ton of coal transported. *Id.* at 15–16. The lessee was also required to pay a "tonnage royalty," for every ton of merchantable coal removed from the leasehold. *Id.* at 10–12. Further, under Section 6 of the Lease, the lessee "agree[d] to mine and remove sufficient coal from the [leasehold] to yield Lessor an annual minimum royalty." *Id.* at 12. That annual minimum royalty was set by the terms of the Lease at $100,000 for each full calendar year of the lease term; however, it could be adjusted downward when the coal reserves on the property were depleted. *Id.* If the property's proven coal reserves became "diminished or depleted to an amount equal to or less than fifty percent (50%) of the presently existing proven reserves," then the annual minimum royalty decreased to $50,000. *Id.* Similarly, if the proven coal reserves became depleted to an amount equal to or less than twenty-five percent or ten percent "of the presently existing proven reserves," then the annual minimum royalty decreased to $25,000 or $10,000, respectively. *Id.*

Section 12 of the Lease addresses the consequences of the lessee's default. That provision provides that, if the lessee fails to pay these royalties within sixty days of the due date, the lessor could "at its option, terminate and cancel this lease and all rights created hereunder by giving written notice by Certified Mail to Lessee of its intention to declare the rights and privileges herein forfeited." *Id.* at 20. Upon receipt of such notice, the lessee "shall have 30 days . . . within which to remedy or cure its default." *Id.* If the lessee remedies or cures the default within that time period, the Lease continues uninterrupted. *Id.* However, "[i]f the Lessee fails to remedy or cure its default within said period of time, the rights and privileges granted hereunder shall cease," at which point the Lease "shall become null and void and of no further effect." *Id.*

**B.  The Alleged Pre-Bankruptcy Breach and Termination of the Lease for Failure to Pay the 2018 Royalty Payments (Due in 2019)**

On February 1, 2019, Hazard Coal notified Perry County Coal's parent company, Cambrian Holding Company, Inc. ("Cambrian Holding"), that Perry County Coal owed $27,656.04 for wheelage fees from April 2018 through December 2018. [R. 61-2, p. 9]. Hazard Coal also demanded $100,000 for Perry County Coal's 2019 annual minimum royalty obligation. *Id.*

Apparently, these amounts went unpaid. On May 7, 2019, Hazard Coal sent a notice of default and demanded payment of $32,943.21 for the April 2018 through March 2019 wheelage fees, as well as the $100,000 annual minimum royalty obligation for 2019. *Id.* On May 31, 2019, Perry County Coal provided to Hazard Coal a payment of $35,451.81, to cover its wheelage obligations and $25,000 for the minimum royalty payment. *Id.*  To explain the reduced royalty payment, Perry County Coal cited to Section 6 of the Lease. *Id.* As noted above, Section 6 allows for a reduction in the royalties when the proven coal reserves have been diminished or depleted to an amount less than or equal to "twenty-five percent (25%) of the presently existing proven reserves." [R. 44-2, p. 12].

Hazard Coal acknowledged its receipt of the payments, but it returned the $25,000 royalty payment. [R. 61-2, p. 9]. In a letter dated June 7, 2019, Hazard Coal explained that the amount provided was "an insufficient cure for the default mentioned" in its May 7, 2019 notice. *Id.*  Soon after, on June 12, 2019, Hazard Coal contacted Cambrian Holding and advised that the default had not been cured and, as result, the Lease was "null and void and of no further effect." *Id.*

**C.  The Bankruptcy Proceeding and Sale of the Debtors' Assets**

On June 16, 2019, Cambrian Holding and eighteen related entities filed voluntary Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the Eastern District of Kentucky, which were ultimately jointly administered. [R. 61-2, p. 2]. The debtors included the Lease in a list of assets available for sale in the bankruptcy proceeding. *Id.* at 10. Hazard Coal was identified as a creditor of Perry County Coal and was notified of the bankruptcy proceedings on or about June 26, 2019. *Id.* at 2–3.

On August 7, 2019, the Bankruptcy Court entered an order that, among other things, established the bidding and sale procedures for the debtors' assets. [R. 44-4]. That order also scheduled a sale hearing for September 24, 2019 and outlined various objection deadlines, including deadlines for objecting to cure costs (September 9, 2019), objecting to the assumption and assignment of any contracts or leases (September 16, 2019), and objecting to approval of the sale of the assets (September 20, 2019). *Id.* at 6–10. The order further explained the failure to timely object would result in that party being "forever barred from asserting any objection to entry of the Sale Order or consummation of the applicable Sale Transaction," and said party would be "deemed to have consented to entry of the Sale Order and consummation of the Sale Transaction." *Id.* at 9. These same deadlines and warnings were set forth in a Notice of Auction and Sale Hearing for the Sale of Debtors' Assets filed on August 7, 2019. [R. 61-2, p. 4].

Hazard Coal did not file objections to the cure costs, the assumption and assignment of the Lease, or approval of the sale of the Lease by the deadlines set forth in the Bankruptcy Court's August 7, 2019 order. *Id.* However, on August 8, 2019, Hazard filed a Proof of Claim asserting a claim of $138,069.27 for wheelage fees and the annual minimum royalty payment. *Id.*

On August 23, 2019, the debtors filed notice of the potential assumption and assignment of their contracts and leases and the respective cure amounts. *Id.* at 5. The cure amount listed for

the Lease was $198,375.99. *Id.* Said notice was mailed to Hazard Coal Corporation on August 26, 2019. *Id.*

An auction of the debtors' assets took place on September 19, 2019. *Id.* At that time, Pristine Clean Energy LLC was designated as the successful bidder for the Perry County assets, including the Lease. [R. 44-8, p. 1]. However, when that entity failed to move forward with the transaction, the bidding process for the Perry County assets was reopened on September 22, 2019. *Id.* at 1–2. The following day, ARC was declared the successful bidder for the Perry County assets. *Id.* at 2. Notice of the successful bid was filed in the record on September 23, 2019. *Id.*

A copy of an executed General Assignment and Assumption Agreement and Bill of Sale, dated September 23, 2019, was also filed with the Bankruptcy Court. [R. 44-7]. Attached to that document is a Permit Operating Agreement (hereinafter, "Form Permit Operating Agreement"), which would allow mining to begin while the parties waited for permits to be transferred to ARC. *Id.* at 12–23. Under Paragraph 13 of the Form Permit Operating Agreement, the transferee warrants that neither it nor its affiliates "is permit blocked on the Applicant Violator System by any governmental body." *Id.* at 19. The Applicant Violator System ("AVS") is maintained by the United States Department of the Interior and lists parties that may not obtain permits due to prior violations of federal laws or regulations. [R. 36-8, p. 2]. The parties do not dispute that, at the time that this document was executed, ARC was "permit blocked" and, as a result, could not obtain the necessary permits for mining on the leasehold. *See id.* at 3–5.

The Bankruptcy Court then held its sale hearing on September 24, 2019, wherein the Bankruptcy Court considered the timely filed objections to the proposed sales of the various contracts and leases. [R. 61-2, p. 5]. After the hearing began, Hazard Coal filed in the record a

Notice of Entry of Appearance and Objection to Motion to Approve Auction Bid. *Id.*  However, Hazard Coal did not attend the sale hearing or otherwise notify the Court or the parties of its last-minute filing, and it appears that the Bankruptcy Court continued with the hearing, unaware of Hazard Coal's late objection. *Id.*

The Bankruptcy Court then entered a Sale Order approving of the sale of the debtors' assets and the assumption and assignment of the debtors' contracts, including the Lease. [R. 36-6, R. 36-7]. Attached to the Sale Order were various documents, including the General Assignment and Assumption Agreement and Bill of Sale and the Form Permit Operating Agreement referenced above, in which APC warranted that it was not permit blocked. [R. 36-7, pp. 58–79].

In the Sale Order, the Bankruptcy Court found that all interested persons and entities had been provided sufficient notice of the sale and an adequate opportunity to object. *Id.* at 3–4. Thus, the Sale Order provided that the counterparties to the various assigned contracts were "forever barred, estopped and permanently enjoined from raising or asserting against the Debtors or the Buyers, or the property of any of them, any assignment fee, default, breach, claim, pecuniary loss, liability or obligation . . . in connection with, or in any way related to the Assigned Contracts," including the Lease. *Id.* at 17.

The sale of the debtors' assets closed on September 27, 2019. *Id.* at 6. On December 18, 2019, the debtors filed the final executed version of the General Assignment and Assumption Agreement and Bill of Sale entered into between the debtors and ARC. [R. 44-9]. Like the non-final version filed prior to the Sale Order, this document also contained a Permit Operating Agreement (hereinafter, "Final Permit Operating Agreement"). *Id.* at 13–25. Paragraph 13 of that Final Permit Operating Agreement explained that, if ARC was found to be permit blocked on the

Applicant Violator System, "then any permit block would not reasonably be expected to have a material adverse effect on the transfer of the Permits or Transferee's conduct of operations under the Permits." *Id.* at 20. This differs from Paragraph 13 of the Form Permit Operating Agreement in which ARC represented that neither it nor its affiliates were permit blocked. [R. 44-7, p. 19].

### D.  Hazard Coal's Challenges to the Sale Order

Hazard Coal made several challenges to the Sale Order in different forums. First, on September 26, 2019, Hazard Coal filed a complaint against ARC in Perry Circuit Court, seeking an injunction to prevent assignment of the Lease. [R. 61-2, p. 7]. The following day, ARC filed a Notice of Removal, but the notice was not processed by the Circuit Court clerk for procedural reasons. *Id.* It is unclear what additional action, if any, was taken in that state court suit.

Meanwhile, on October 1, 2019, ARC delivered to Hazard Coal a check for $198,375.99, to cover its cure costs pursuant to the Bankruptcy Court's orders. *Id.*; *see also id.* at 5. Soon after, on October 4, 2019, Hazard Coal filed an adversary proceeding in the Bankruptcy Court, seeking a declaratory judgment that the Lease terminated prior to the filing of the bankruptcy petitions as a result of the lessee's failure to pay the 2018 royalties, and, as a result, the Lease was not part of the bankruptcy estate transferred to ARC. *Id.* at 2. A few days later, on October 9, 2019, Hazard Coal returned ARC's cure payment and filed a Motion to Reconsider in the bankruptcy proceeding. *Id.* Specifically, Hazard Coal asked the Bankruptcy Court to reconsider its Sale Order with respect to ARC. *Id.*

Then, on October 23, 2019, Hazard Coal filed a motion for temporary relief in the adversary proceeding. *Id.* at 7. Specifically, Hazard Coal sought a temporary restraining order to prevent ARC from entering the Perry County property and acting under the Lease. *Id.* That

motion was ultimately resolved by agreement of the parties, including an agreement that the cure payment would be deposited in the escrow account of Hazard Coal's counsel. *Id.* at 7–8.

On November 21, 2019, the Bankruptcy Court held a status conference. *Id.* at 8.  At that hearing, the parties agreed that the threshold issue before the Bankruptcy Court was whether the Sale Order barred Hazard Coal from disputing the assumption, assignment, and validity of the Lease. *Id.* On January 3, 2020, after the matter had been fully briefed, the Bankruptcy Court issued an order addressing that issue and denying Hazard Coal's Motion to Reconsider. *Id.*

In that order, the Bankruptcy Court first held that Perry County Coal retained a disputed interest in the Lease at the commencement of the bankruptcy proceedings, despite Hazard Coal's allegations that the Lease terminated in 2019 due to Perry County Coal's failure to pay the 2018 royalties. *Id.* at 8–10. It explained that, if the proven coal reserves *had* been reduced to twenty-five percent or less "of the proven coal reserves when the Lease was executed," then Perry County Coal had fully complied with the terms of the Lease when it tendered the $25,000 check for the 2018 annual minimum royalties. *Id* at 9–10. That specific issue was disputed at the time the bankruptcy petitions were filed, and Perry County Coal therefore retained a disputed interest in the Lease. *Id.* at 10.

The Bankruptcy Court next found that its Sale Order barred Hazard Coal's claims, citing the doctrine of res judicata. *Id.* at 10–12. On this point, the Bankruptcy Court noted that Hazard had early notice of the debtors' intentions to sell their interest in the Lease, yet it had ignored the clear objection deadlines set forth in the Bankruptcy Court's prior order, and had failed to attend the auction. *Id.* at 11–12. Lastly, the Bankruptcy Court noted that Hazard Coal had failed to satisfy Federal Rule of Civil Procedure 59 for motions to reconsider. *Id.* at 12–16.

Hazard Coal next filed an Expedited Motion Compelling American Resources Corporation to Restore Electrical Power to the Mine, Or, In the Alternative, Motion to Rescind Sale ("Motion to Restore Power or Rescind Sale") in the bankruptcy proceeding. [R. 59-16]. Apparently, ARC had failed to pay its utility bills, resulting in the electrical service to the mine being terminated. *Id.* at 1. Hazard Coal claimed that this was a breach of the Lease and would cause material damage, and it therefore asked the Bankruptcy Court to compel ARC to restore the electricity or, in the alternative, to rescind the Sale Order. *Id.*

The Bankruptcy Court denied that motion by order dated January 17, 2020. [R. 59-16]. The Bankruptcy Court first noted that "[t]he Debtors assumed and assigned a coal mining lease with Hazard Coal to [ARC] pursuant to the Sale Order entered on September 25, 2019," as described in the Bankruptcy Court's January 3, 2020 order. *Id.* at 1. With respect to the relief requested by Hazard Coal, the Bankruptcy Court explained, "Hazard Coal has not justified the need for the Bankruptcy Court to decide a state law lease dispute between these parties." *Id.* at 2. It also noted that Hazard Coal's arguments for rescinding the Sale Order had already been rejected in the January 3, 2020 order. *Id.*

### E.  The State Court Suit and Removal to Federal Court

On January 17, 2020—the same day that the Bankruptcy Court denied Hazard Coal's motion—Hazard Coal filed another suit against ARC in Perry Circuit Court, [R. 1-1], apparently relying on the Bankruptcy Court's reference to a "state law lease dispute." In its Complaint, Hazard Coal asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and waste, and it also sought injunctive relief to prevent ARC from acting under the Lease. [R. 1-1, pp. 1–39]. With its Complaint, Hazard Coal also filed a Motion for Injunctive Relief. *Id.* at 40–53. In that motion, Hazard Coal sought a temporary injunction or temporary

restraining order enjoining Defendants from entering the Perry County property, causing the power to be turned on, or taking other steps to provide power to the mines on the property. *Id.* at 41. That same day, ARC removed the matter to this Court. [R. 1].

Soon after, on January 28, 2020, the Court conducted a telephonic status conference with the parties. [R. 11]. At that status conference, Hazard Coal indicated its intent to withdraw its Motion for Injunctive Relief. *Id.* Hazard Coal ultimately filed a motion to this effect, which the Court granted. [R. 12, R. 13].

Hazard Coal then filed an Amended Complaint, asserting the following claims: breach of the Lease (Count I); waste (Count II); abandonment (Count III); and breach of the implied covenant of good faith and fair dealing (Count IV). [R. 15]. Hazard Coal also sought injunctive relief (Count V). *Id.* at 13. With respect to Count I for breach of the Lease, Hazard Coal alleges, "On January 1, 2020, ARC failed to pay Hazard Coal the required $100,000.00 Annual Minimum Royalty Payment, and such failure has not been cured." *Id.* at ¶ 23. In other words, Hazard Coal alleged in its amended complaint that ARC breached the Lease by failing to pay the 2019 annual minimum royalties that became due on or about January 1, 2020.

### F. The Alleged Termination of the Lease Due to Defendants' Failure to Pay the 2019 Royalty Payments (Due in 2020)

On March 24, 2020, after answering Hazard Coal's amended complaint, Defendants tendered to Hazard Coal a check for $50,000 as payment for its 2019 annual minimum royalty. [R. 45-3]. In a letter to Hazard Coal, Defendant Perry County Resources noted that, pursuant to Section 6 of the Lease, the lessee could "adjust the annual minimum royalty due to Hazard Coal based on coal reserves that are diminished or depleted within the Hazard Coal Lease." *Id.*  Perry County Resources then explained that a professional engineer had determined that the coal

reserves within the leasehold had been depleted by approximately fifty-two percent. *Id.* Thus, Defendants had tendered only $50,000. *Id.*

By letter dated April 9, 2020, Hazard Coal advised Perry County Resources of its default, noting that it had not paid the $100,000 annual minimum royalty and had not "provided any evidence which justifies a reduction of the $100,000 annual minimum royalty." [R. 45-4]. As a result, Hazard Coal provided notice of intent to terminate the Lease, citing Section 12 of the Lease. *Id.* It further noted that the Lease would "become null and void and of no further effect" if Perry County Resources failed to cure the default within thirty days of the notice. *Id.*

### G. Proceedings in Federal Court

On June 30, 2020, ARC filed a Counterclaim against Hazard Coal. [R. 33]. In its Counterclaim, ARC alleged that Hazard Coal had tortuously interfered with ARC's business and business relationships. *Id.*

Meanwhile, discovery ensued, and both parties gave notice of their expert witnesses. Hazard Coal retained professional engineer J. Steven Gardner, who opined that, among other things, the proven coal reserves on the leasehold had not been diminished or depleted to an amount equal to or less than fifty percent of the proven reserves in existence on January 1, 1982, the commencement date of the Lease. [R. 45-8]. Under Mr. Gardner's analysis, Defendants would not be entitled to a reduced annual royalty payment for 2019 and had therefore breached the Lease.

On July 13, 2020, Defendants tendered the March 24, 2020 "Engineering Report" of Mr. Richard Dirk Smith as their expert witness report. [R. 45-9]. In that report and a subsequent deposition, Mr. Smith explained that, after a cursory review, he found that the proven coal resources on the leasehold *had* been diminished or depleted to an amount equal to fifty percent of

- 12 -

the proven reserves in existence on July 8, 1960, which is the date Defendants argue a leasehold began on the property. *Id.*; [R. 45-1]. Under Mr. Smith's analysis, Defendants would be entitled to a reduced annual royalty payment for 2019.

On August 10, 2020, Hazard Coal filed a Motion for Temporary Restraining Order, asking the Court to enjoin ARC from removing certain improvements on the property. [R. 39]. The Court entered an order denying the motion on August 18, 2020. [R. 43]. In that order, the Court explained that Hazard Coal had failed to demonstrate irreparable harm, and a temporary restraining order was therefore inappropriate. *Id.*

On October 14, 2020, Hazard Coal filed the pending Motion for Summary Judgment. [R. 44]. Hazard Coal argues that it is entitled to summary judgment because the Bankruptcy Court did not approve the assignment of the Lease and there is no writing to satisfy the statute of frauds, and any assignment of the Lease to Defendants was the result of fraud upon the Bankruptcy Court. [R 44-1, pp. 18–20]. Hazard further argues that, even if the Lease was properly assigned to ARC, the Lease terminated by its own terms when Defendants failed to pay the 2019 royalties when they became due in 2020. *Id.* at 15–18. Hazard Coal also seeks dismissal of Defendant's counterclaim as untimely and for failure to state a claim. *Id.* at 21–24. ARC has responded, [R. 50], and Hazard Coal has replied, [R. 51].

Hazard Coal also filed the pending Motion to Exclude Expert Testimony on October 14, 2020. [R. 45]. In that motion, Hazard Coal asks the Court to exclude the expert testimony of Mr. Smith, the professional engineer hired by Defendants. Defendants have responded, [R. 49], and Hazard Coal has replied, [R. 52].[3]

---

[3] In preparation for the September 7, 2021 jury trial, which has since been continued, Hazard Coal also filed a Motion in Limine, seeking to exclude, among other things, the expert testimony of Mr. Smith. [R. 68]. That Motion was referred to Magistrate Judge Hanly A. Ingram and remains pending. To the extent the Motion in Limine seeks

### H.  The Bankruptcy Court's January 22, 2021 Order

While Hazard Coal's motions remained pending before this Court, ARC sought

clarification from the Bankruptcy Court. Specifically, ARC filed a Motion for Declaration or

[sic] Rights Regarding the Assumption and Assignment of the Hazard Coal Company Lease

("Motion for Declaration of Rights"). [R. 58-2]. In that motion, ARC explained that, despite the

Bankruptcy Court's prior orders, Hazard Coal continued to collaterally attack the Sale Order. *Id.*

at 2. ARC therefore asked the Bankruptcy Court to "enter an Order clearly setting forth and

affirming its earlier findings that the [Lease] was properly assumed by the Debtors and properly

assigned to ARC." *Id.* at 2–3.

After the matter had been briefed and oral arguments conducted, the Bankruptcy Court

issued its decision on January 22, 2021. [R. 58-1]. In that Order, the Bankruptcy Court noted that

"[t]he relief requested is already in the record" but acknowledged that, based on the arguments of

the parties, "an additional order is beneficial." *Id.* at 1. The Bankruptcy Court then explained,

> The January 3 Order (i) confirms the Debtor's assumption of the Lease and
> assignment to American Resources Corporation; (ii) recognizes that transfer was
> authorized by the [Sale] Order approving the sale and substantially all the Debtors'
> assets entered on September 25, 2019; and (iii) ruled that Hazard Coal could not
> collaterally attack the assumption and assignment by arguing the Lease was
> terminated prepetition.

*Id.* at 1–3 (internal citations omitted). "If there was any doubt," the Bankruptcy Court explained,

it had directly stated that this is what occurred in its January 17, 2020 order denying Hazard Coal's

Motion to Restore Power or Rescind Sale. In that order, the Bankruptcy Court stated,

> The Debtors assumed and assigned a coal mining lease with Hazard Coal
> Corporation to American Resources Corporation ("ARC") pursuant to the Sale
> Order entered on September 25, 2019. The transfer is more fully described in the
> Memorandum Opinion and Order entered on January 3, 2020.

---

exclusion of Mr. Smith's report and testimony, it will be denied as moot. To the extent the Motion in Limine seeks
to exclude matters not covered by this Memorandum Opinion and Order, it will be denied without prejudice.

*Id.* at 2 (quoting R. 59-16). The Bankruptcy Court further explained that ARC's payment of cure costs to Hazard Coal "ended any dispute over pre-assumption defaults." *Id.* In other words, ARC had cured any alleged default stemming from the 2018 royalties (which had become due in 2019).

Lastly, the Bankruptcy Court addressed two other issues. First, it clarified that it had never invited Hazard Coal to file suit in state court. *Id.* Rather, in response to Hazard's Motion to Restore Power or Rescind Sale, the Bankruptcy Court had stated, "Hazard Coal has not justified the need for the Bankruptcy Court to decide a state law lease dispute between these parties." [R. 59-16, p. 2]. In other words, it had simply denied the requested relief after concluding that it was a "state law lease dispute" between non-debtor parties. *Id.* The Bankruptcy Court clarified that "Hazard Coal was not invited, directed, or otherwise told to re-litigate the assumption and assignment question in any other forum because it was already decided in this Court." *Id.* at 2–3.

Second, with respect to Hazard Coal's fraud argument "regarding the changes made to the form assignment attached to the Sale Order and the executed assignment," the Bankruptcy Court noted that it had already addressed this issue in its January 3, 2020 order. *Id.* at 3 In that order, the Bankruptcy Court "determined that the alteration did not affect the assumption and assignment of the Lease or the conclusion that Hazard Coal was estopped from disputing the transfer." *Id.*

Having resolved these issues, the Bankruptcy Court concluded, "It is ordered that the record stands. This order does not alter the earlier decisions; it is entered to assist the parties' understanding of prior orders." *Id.* at 3 (citations omitted).

Shortly after the Bankruptcy Court issued its decision, ARC filed notice of that order with this Court. [R. 58]. In response, the Court directed the parties to file supplemental briefs addressing the effect, if any, of the January 22, 2021 Bankruptcy Court order on the pending motions. [R. 60]. The parties complied with the Court's order, [R. 61, R. 62].

In its brief, Hazard Coal argues that that the January 22, 2021 order does not affect (1) the specific question of whether the Lease was terminated *after* its assignment to Defendants as a result of Defendants' failure to pay the 2019 royalties, and (2) Hazard Coal's claim that Defendants' counterclaim should be dismissed on procedural grounds. [R. 61, p. 3]. Hazard acknowledges that the order may affect its claim that the Lease was never formally assigned to ARC, but argues that is not prevented from arguing that ARC lacks title to the Lease for various reasons, including, among other things, failure to satisfy the Statute of Frauds and ARC's alleged fraud on the Bankruptcy Court. *Id.* at 3–7.

Defendants agree that the January 22, 2021 Bankruptcy Court order does not affect the specific question of whether the Lease terminated by its own terms *after* its assignment to Defendants, as a result of Defendants' alleged failure to timely pay the 2019 royalties. [R. 62, p. 2]. However, Defendants argue, the January 22, 2021 order prevents Hazard Coal from arguing that the Lease was never assigned to Defendants or that the assignment was a result of Defendants' fraud on the Bankruptcy Court. *Id.* at 3–4.

**I.   ARC's Permit Eligibility**

After the parties filed their supplemental briefs, ARC and other similar entities entered into an Agreed Order with Kentucky's Energy and Environment Cabinet, dated March 25, 2021. [R. 64-1]. In that Agreed Order, ARC agreed to remediate the past violations that resulted in it being permit blocked. *Id.* ARC has since filed a Notice of Permit Eligibility with the Court, explaining that it is no longer "permit blocked" and is now eligible to receive the necessary transfer permits. [R. 63]. Hazard Coal represents that Defendants have started the transfer process for the permits associated with leasehold, and Hazard Coal has objected in that

administrative proceeding. [R. 65, pp. 6–7]. At this time, the record does not reflect that the permits have been transferred to ARC.

### J.   Hazard Coal's Appeal of the January 22, 2021 Bankruptcy Court Order

Meanwhile, on February 8, 2021, Hazard Coal filed notice of its appeal of the January 22, 2021 Bankruptcy Court Order. [R. 59]. On June 14, 2021, Hazard Coal filed the pending Motion for Adjudication and Stay, asking that this Court resolve the specific issue of whether the Lease terminated in 2020 as a result of Defendants' failure to pay the 2019 royalties, and then stay all remaining matters in the case pending resolution of Hazard Coal's appeal of the January 22, 2021 Bankruptcy Court Order. [R. 65]. Defendants responded, stating no objection. [R. 66].

As noted above, the three pending motions—the Motion for Summary Judgment, [R. 44], Motion to Exclude Expert Testimony, [R. 45], and Motion for Adjudication and Stay, [R. 65]— have been fully briefed and are ripe for review.

## II.   ANALYSIS

### A.   Motion for Adjudication and Stay, [R. 65]

In its most recent motion, Hazard Coal first requests that the Court adjudicate the lease termination issue set forth in its Motion for Summary Judgment, that is, whether Defendants breached the Lease by failing to pay the annual minimum royalties for 2019, which became due in 2020. [R. 65, p. 2–8]. For support, Hazard Coal explains that the pending transfer of permits to ARC depends on whether ARC has a legal right to enter the property covered by the permits. *Id.* at 7–8. Hazard Coal argues that, if the Lease terminated in May 2020 due to Defendants' failure to pay the 2019 royalties, then ARC has no legal right of entry on the property and cannot receive a permit. *Id.* It therefore asks the Court to resolve that issue now, to prevent ARC from receiving a permit without a valid right of entry. *Id.* Defendants have no objection to this request.

[R. 66, p. 1]. Further, both parties agree that this specific issue is unaffected by the pending appeal of the Bankruptcy Court's January 22, 2021 order, and the Court agrees. [R. 61, p. 3–4; R. 62, p. 2].

Hazard Coal next requests that all remaining issues be stayed pending resolution of that appeal. [R. 65, p. 8–9]. Defendants responded, stating no objection to that request to stay the remaining matters, "at least until the Court rules upon the Lease termination issue." *Id.* at 2.[4] Having reviewed Hazard Coal's motion, the Bankruptcy Court's orders, and the record in this matter, the Court finds that it would be appropriate to rule on the limited issue of whether Defendants breached the Lease in 2020 by failing to pay the 2019 royalties, and then stay the case pending resolution of Hazard Coal's appeal. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (a court may hold a case in abeyance pursuant to its inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants"). Accordingly, the Court will grant Hazard Coal's Motion for Adjudication and Stay, [R. 65].

### B. Motion for Summary Judgment, [R. 44]

#### 1. Standard of Review

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it first finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"

---

[4] Defendants' concern was that it would be difficult to comply with the deadlines set forth in this Court's Scheduling Order, [R. 19, R. 57], but the Court has since rescheduled the jury trial in this case, [R. 78, R 80], thereby extending those deadlines.

*Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 256. Once the moving party satisfies this burden, the non-moving party thereafter must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, the non-movant must do "more than simply show that there is some metaphysical doubt as to the material facts." *Moore v. Philip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Rather, the non-movant "must present significant probative evidence in support of its complaint to defeat the motion for summary judgment." *Id.* (citing *Anderson*, 447 U.S. at 249–50).

Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

### 2. The Lease Termination Issue

As noted above, the only issue presently before the Court is whether Defendants breached the Lease in 2020 by failing to pay the 2019 royalties in full, thereby resulting in termination of

the Lease. *See supra* Section II(A). On this specific issue, Hazard Coal argues that the correct annual minimum royalty payment for 2019 (due in 2020) was $100,000 under Section 6 of the Lease, and Defendants therefore breached the Lease by tendering only $50,000. [R. 44-1, pp. 15–18]. In response, Defendants argue that the correct annual minimum royalty payment for 2019 was $50,000, due to the depletion of the coal reserves, as set forth in Section 6 of the Lease. [R. 50-1, pp. 5–6]. Defendants further argue that, even if Hazard Coal correctly calculated the 2019 royalties, termination is inappropriate because it tendered a timely payment in good faith, prior to any loss or substantial damage to Hazard Coal. *Id.* at 6–8.

Clearly, then, the issue of whether the Lease was breached for failure to pay the 2019 royalties depends on the calculation of the annual minimum royalty for that year. Stated another way, if Hazard Coal correctly calculated the annual minimum royalty for 2019 as $100,000, then Defendants' failure to pay the full amount was a breach of the Lease, and their failure to timely cure that breach after written notice could result in the Lease's termination. On the other hand, if Defendants correctly calculated the annual minimum royalty for 2019 as $50,000, then they satisfied their obligation under the Lease by tendering to Hazard Coal a check for that amount.

The correct calculation of the 2019 royalties, in turn, depends on whether the "proven coal reserves [were] diminished or depleted to an amount equal to or less than fifty percent (50%) of the presently existing proven reserves," as stated in the Lease. [R. 44-2, p. 12]. On this point, Hazard Coal argues that the phrase "presently existing" "refers to the present time when the [Lease] was executed." [R. 44-1, p. 16]. In other words, Hazard Coal argues that the proven coal reserves must be diminished or depleted to an amount equal to or less than fifty percent of the proven coal reserves in existence on January 1, 1982, the date the Lease commenced.[5]

---

[5] The Lease was executed on December 1, 1981. [R. 44-2, p. 1]. However, Section 6 of the Lease makes clear that the lease term commenced on January 1, 1982. *Id.* at 12.

Defendants, on the other hand, argue that the correct start date for the depletion calculations should be July 8, 1960, the date that Mr. Elmer Whitaker originally entered into a lease arrangement with Hazard Coal. [R. 50-1, pp. 5–6].

Thus, to determine which party correctly calculated the 2019 annual minimum royalty and thereby determine if a breach occurred in 2020, the Court must first determine whether the phrase "presently existing proven reserves," as used in Section 6 of the Lease, refers to those proven coal reserves in existence on January 1, 1982 or July 8, 1960.

### a. Under the plain language of the Lease, the depletion calculations should begin on January 1, 1982, the date the Lease commenced.

The specific issue before the Court is a question of contract interpretation. In resolving that question, the Court applies the substantive law of Kentucky. *Hayes v. Equitable Energy Resources Co.*, 266 F.3d 560, 566 (6th Cir. 2001). Under Kentucky law, the "construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105 (Ky. 2003). In analyzing a breach of contract claim, the Court "must begin with an examination of the plain language of the instrument." *Kentucky Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016). An unambiguous contract will be enforced strictly according to its terms by assigning the contract's language its ordinary meaning and without resort to extrinsic evidence. *Frear*, 103 S.W.3d at 106. Thus, "[w]hen no ambiguity exists in the contract" the Court must "look only as far as the four corners of the document to determine the parties' intentions." *Kentucky Shakespeare Festival*, 490 S.W.3d at 695.

On the other hand, "if a reasonable person would find [the contract] susceptible to different or inconsistent interpretations," then it is ambiguous. *Hazard Coal Corporation v. Knight*, 325 S.W.3d 290, 298 (Ky. 2010) (quoting *Cantrell Supply Inc. v. Liberty Mut. Ins. Co.*,

94 S.W.3d 381, 385 (Ky. App. 2002)); *Central Bank & Trust Co. v. Kincaid,* Ky., 617 S.W.2d 32, 33 (1981) ("An ambiguous contract is one capable of more than one different, reasonable interpretation."). Nevertheless, "[t]he fact that one party may have intended different results . . . is insufficient to construe a contract at variance with its plain and unambiguous terms." *Abney v. Nationwide Mutual Insurance Company*, 215 S.W.3d 699, 703 (Ky. 2006). "Where a contract is ambiguous or silent on a vital matter, a court may consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties." *Id.* However, if the contract is ambiguous and there are material disputes concerning the extrinsic evidence, these factual issues are "subject to resolution by the fact-finder" *Id.*; *Equitania Ins. Co. v. Slone & Garrett, P.S.C.*, 191 S.W.3d 552, 556 (Ky. 2006) ("Certainly, if the writing is ambiguous, the factual question of what the parties intended is for the jury to decide.").

In the present case, the contested language is found in Section 6. That provision provides that "Lessee agrees to mine and remove sufficient coal from the Coal Properties to yield Lessor an annual minimum royalty" of $100,000 "[f]or each full calendar year of the lease term . . . commencing with January 1, 1982." [R. 44-2, p. 12]. That amount can be adjusted to $50,000 "[w]hen the proven coal reserves on the Coal Properties are diminished or depleted to an amount equal to or less than fifty percent (50%) of the *presently existing proven reserves*." *Id.* (emphasis added).

Hazard Coal argues that this language is clear and unambiguous. [R. 44-1, p. 16]. It argues that this language "provid[es] plainly that the percentage of depletion is to be calculated based on coal depleted from 'presently existing reserves' with minimum royalties to be paid 'for each full calendar year of the lease term . . . commencing on January 1, 1982.'" *Id.* Hazard Coal

further notes that neither "presently" or "commencing" are technical terms and thus, they can be afforded their plain and ordinary meaning. *Id.* at 16–17. Citing Marriam Webster's Dictionary, Hazard Coal defines "presently" as "at once," "without undue delay," and "at the present time: NOW," and further defines "commencing" as "to enter upon" and begin, to "commence proceedings," and "to have or make a beginning: START." *Id.* "In other words," Hazard Coal argues, "'presently' connotes the date on which the [Lease] was executed or dated and 'commencing' means January 1, 1982." *Id.* at 17. Thus, Hazard Coal asserts, the depletion calculations should begin from January 1, 1982, the date the Lease term began. *Id.*

In response, Defendants cite to the portion of the Lease stating that "Lessor desires to lease to Lessee all the coal properties, coal and seams of coal owned by Lessor and located in Perry County, Kentucky, and to incorporate all previous lease agreements into this Agreement." [R. 50-1, p. 5]; *see also* [R. 44-2, p. 2]. Defendants argue that this language is not an amendment of the Original Lease and is instead "an incorporation of the terms previously agreed upon by the parties." [R. 50-1, p. 6]. Thus, Defendants argue, "[T]he 1981 Lease incorporated all the prior agreements between the parties and obviously incorporated prior agreements of the parties relating to depletion of the coal reserves and the method for reduction in minimum royalties." *Id.* They further argue that "[t]he fact that the 1981 Lease does not mention any amendment of prior lease terms is evidence that it was the intent of the parties that any calculation of the depletion of proven coal reserves under the Lease related back to July 8, 1960." *Id.*

Defendants' argument fails for multiple reasons. First, while Defendants claim that the Lease incorporated "prior agreements of the parties relating to depletion of the coal reserves and the method for reduction in minimum royalties," *id.*,  Defendants do not provide—or even cite to—the Original Lease agreement or any of its prior amendments. Simply stated, they have

- 23 -

provided no evidence that the Original Lease agreements contained any terms related to the present royalty calculation issue.

Further, the Lease clearly states, "The Original Lease [and its amendments] are merged into this agreement *and to the extent the terms and conditions of those agreements may conflict with this agreement, this agreement shall control.*" [R. 44-2, p. 23]. Thus, even if the Court assumes that the Original Lease contained a similar provision allowing the annual minimum royalty to be reduced based on the depletion of the proven coal reserves, and even if it assumed that the Original Lease expressly stated that the start date of that depletion calculation should be July 8, 1960, the current Lease's Section 6 would control.

Having concluded that the terms of the present Lease are controlling, the Court now considers whether the phrase "presently proven existing reserves" refers to those reserves in existence on January 1, 1982 or July 8, 1960. As noted above, Hazard Coal argues that these terms are unambiguous and should be afforded their ordinary meaning. Defendants do not argue that these terms are ambiguous, and instead rely solely on their argument that the Original Lease terms control.

Having reviewed the Lease as a whole, the Court agrees with Hazard Coal's position that these terms are not ambiguous. The phrase "presently proven existing reserves" is simply not subject to more than one reasonable interpretation. Stated another way, a reasonable reader of the Lease would not conclude that the term "presently existing" refers to those coal reserves in existence over twenty years earlier. The term "presently," together with the present tense of "existing," clearly describes the coal reserves in existence at the time the Lease commenced. *See generally Bonnichsen v. United States*, 217 F.Supp.2d 1116 (D. Or. 2002) (finding that the Native American Graves Protection and Repatriation Act's use of present tense language

indicated an intent to refer to *presently existing* tribes, people, or culture); *Alvarez v. City of Philadelphia*, Nos. 77-4424, 79-375 and 79-1192, 1986 WL 1524, *2–3 (E.D. Pa. Feb. 4, 1986) (explaining that the phrase "presently qualified" in a consent decree meant that an applicant must be qualified "under present standards," not under prior standards in effect before the consent decree was entered). Further, the commencement date of January 1, 1982 appears in Section 6, just above the "presently existing language," which further indicates that the relevant start date is January 1, 1982.

Accordingly, the Court finds that the language "presently existing proven reserves" as used in Section 6 of the Lease refers to the coal reserves in existence on January 1, 1982, the date the Lease term commenced.

> **b. Based on the evidence of record, Defendants failed to pay in full the required annual minimum royalty for 2019.**

Having determined that the appropriate start date for the depletion calculations is January 1, 1982, the Court must now consider whether the proven coal reserves in 2019 were diminished or depleted to an amount less than or equal to fifty-percent of the coal reserves in existence on January 2, 1982. On this issue, Hazard Coal points to the expert report of professional engineer J. Steven Gardner. [R. 44-1, p. 16; R. 44-27]. Mr. Gardner's expert report and an excerpt from his deposition have been filed in the record. [R. 44-27]. The report explains that Mr. Gardner and his employer, SynTerra Corporation, were retained by Hazard to review and comment on the percent of coal reserves subject to the Lease "relative to the coal resources/reserves on January 1, 1982, the effective date of the Lease." *Id.* at 1. They were also asked to review and comment on Defendants' ability to hold permits in Kentucky "as relates to the abandonment of the Lease." *Id.* In its Summary and Conclusions section, the report states that "[c]oal resources/reserves on the [Lease] dated December 1, 1981 with an effective date of January 1, 1982 have not been

depleted below 50%." *Id.* at 11. Rather, the report concludes, there has been "only 33% depletion on the Lease." *Id.* The report further concludes, "Absent the ability to hold permits in Kentucky, [Defendants] or affiliates under standard accepted industry practice for coal leases have effectively abandoned the lease." *Id.*

Hazard Coal has therefore informed the Court of "the basis for its motion, and identif[ied] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 256. Stated another way, Hazard Coal has pointed to specific evidence of record that the coal reserves in 2019 had *not* been depleted to less than or equal to fifty-percent of the proven coal reserves in existence on January 1, 1982. Defendants must therefore respond with "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc.*, 48 F.3d at 205 (citation omitted).

Defendants have responded with the Engineering Report compiled by professional engineer Richard Dirk Smith, as noted above. [R. 45-9]. The Engineering Report is dated March 24, 2000—the same date that ARC tendered a $50,000 check for payment of the 2019 annual minimum royalties. *Id.* at 1. In that report, Mr. Smith first explains that his employer, East Kentucky Engineering, LLC, "conducted a *cursory* review of the Hazard Coal Corp Lease areas to determine the estimated original coal resources, the depletion of resources, and the estimated resources." *Id.* (emphasis added). He further explains that he was provided maps of the leasehold and mining and core data for the various coal seams on the leasehold, all of which were provided by ARC. *Id.* He states that his report "is a limited *cursory* review of the provided data and should

not be considered as a reserves study." *Id.* (emphasis added). Throughout the report, he repeats that admonition. *See id.* at 2 ("Again, this is a *cursory* review of the original and remaining resources of the Hazard Coal lease area, based upon the information provided. This is not a reserve analysis and in no fashion does it represent the merchantable coal associated with the lease." (emphasis added)); *id.* at 5 ("This is a cursory review of the resources associated with the Hazard Coal Corp Lease area that was provided.").

The report goes on to provide tables indicating the "depleted" and "remaining" tons of coal in the various leased coal seams. *Id.* at 3–4. In a summary table, the report indicates that the "total resources" equaled 92,166,658 tons, the depleted resources totaled 48,017,859 tons, and the remaining resources therefore totaled 44,148.801 tons. *Id.* at 4. Nowhere in the report does it indicate what start date Mr. Smith used for his depletion calculations.

However, Defendants also filed in the record excerpts of Mr. Smith's deposition, in which he explains which start date he used and why. [R. 45-10]. In those excerpts, Mr. Smith explains that he was not given a full copy of the Lease but thought he had been provided one page of it, apparently page 12, the page containing the relevant portion of Section 6 relating to the annual minimum royalties. *Id.* at 3–4. When asked if he considered the Lease's commencement date of January 1, 1982 (as stated on page 12 of the Lease), Mr. Smith responds that he "did two analyses." *Id.* at 4. He then explains that he "started one analysis, then I told them that based upon my preliminary information that probably 50 percent of the reserves had [not][6] been depleted," at which point ARC[7] responded, "[W]ell, take it from day one initial, the

---

[6] In the deposition transcript, the word "not" is omitted; however, it is clear from the remainder of the deposition transcript that Mr. Smith initially told ARC that the coal reserves likely had *not* been depleted by fifty percent or more, if he used the January 1, 1982 start date for those calculations.

[7] In his deposition, Mr. Smith refers to a "they," but the parties do not dispute that he is referring to ARC.

reserves there and the reserves depleted." *Id.* at 5. He explains further that, when conducting his first analysis, he "started looking at it from '81 forward, and I told them it probably wouldn't be 50 percent or less," meaning there "probably would not be more than 50 percent depleted." *Id.* At this point, he explains, "they told me to go back prior to original coal there versus total depletion, and that's what I done." *Id.* Apparently, then, Mr. Smith assumed from his reading of page 12 of the Lease that he should begin his calculations with a start date of January 1, 1982, and based on that start date, he did not think fifty percent or more of the reserves had been deleted. *Id.* at 4–5.  Upon relaying this information to ARC, ARC told Mr. Smith to use the July 8, 1960 start date. *Id.* Mr. Smith further stated in his deposition that he had reviewed Mr. Gardner's expert report and did not disagree with it. *Id.* at 19.

As noted above, Plaintiff seeks to exclude Mr. Smith's report and testimony. *See* [R. 45]. However, even if the Court accepts this evidence, the Engineering Report proffered by Mr. Smith, together with the statements made during his deposition, do not create a genuine fact issue for trial. Even if the Court were to accept Mr. Smith's conclusions, they do not contradict Hazard Coal's position or its expert's opinions. Mr. Smith merely concludes that, if the correct start date for the depletion calculations is July 8, 1960, then 44,148,801 tons of coal resources remain—or, in other words, about fifty-two percent of the original resources have been depleted. However, he clarified in his deposition that, if the correct start date for the depletion calculations is January 1, 1982, then he thought it was unlikely that more than fifty percent of the resources had been depleted. He further testified that he did not disagree with Mr. Gardner's report, which concluded that the coal reserves on the leasehold had not been depleted below fifty percent since January 1, 1982. *See* [R. 45-1, p. 6].

Thus, even if the Court assumed that the Engineering Report constitutes a complete, thorough, and final reserve calculation and a competent expert opinion, it is clear that the analysis relies on a start date prior to the January 1, 1982 commencement of the Lease. Defendants have not produced any evidence—or even made any argument—that the proven coal reserves in existence on January 1, 1982 were depleted by fifty percent or more by 2019.  Thus, Defendants have not satisfied their burden of pointing to "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc.*, 48 F.3d at 205 (citation omitted).

The Court therefore concludes that no genuine issue of material fact exists on this issue, and the evidence of record indicates the *proven* coal reserves in existence in 2019 were not less than or equal to fifty percent of the proven coal reserves in existence on January 1, 1982, the commencement date of the Lease. Accordingly, under the terms of the Lease, ARC owed $100,000 for the 2019 annual minimum royalty, and it was in breach of the Lease when it tendered only $50,000 to Hazard Coal on March 24, 2020. Upon receipt of written notice of that breach and Hazard Coal's intention to terminate the Lease, Defendants failed to tender the full annual minimum royalty payment.

### c.   Termination of the Lease is appropriate.

Defendants argue that, even if ARC breached the Lease by failing to tender the full annual minimum royalty payment for 2019, termination of the Lease is not an appropriate remedy. [R. 50-1, pp. 6–8]. For support, Defendants cite to various cases and argue that "Kentucky law abhors the forfeiture of a coal lease." *Id.* at 6. This is especially true, Defendants argue, when the defaulting party makes a timely royalty payment in good faith and before any substantial losses or damage. *Id.* at 6–7 (citing *Carlson v. Kentucky Ridge Coal Co.*, 112 F. Supp.

371, 374 (E.D. Ky. 1953) However, the cases cited by Defendants are easily distinguishable from the present matter.

In *Carlson v. Kentucky Ridge Coal Co.*, the parties engaged in considerable negotiations regarding the lessee's royalty payments before finally reaching an agreement. 112 F. Supp. at 372. The lessee then sought to have that agreement reduced to writing, but one lessor refused to accept the written terms or the lessee's tendered checks. *Id.* at 373. Finally, that lessor agreed in writing to a specific royalty payment, and the lessee mailed a check for that amount to the lessor. *Id.* at 373–74. The lessor testified that she never received the check, and she thereafter provided written notice of her intent to terminate the lease if the payment was not made in thirty days. *Id.* Within the thirty-day window, the lessee tendered a second check for the full agreed-upon amount. *Id.* at 374. The lessor received the check but still sought forfeiture of the lease, claiming the check arrived after the expiration of the thirty-day cure period. *Id.* The Court found that the lessor was not entitled to cancel the lease:

> The evidence is clear that [the lessee] desired to pay the royalty agreed upon and in good faith made every reasonable effort to do so. [The lessor's] reasons for declining to sign the writings submitted to her and for refusing to accept the checks repeatedly tendered to her seem frivolous and untenable.

*Id.* at 375.

The facts in this case are starkly different. In *Carlson*, the lessor agreed on multiple occasions to a specific royalty payment and then, when the lessee paid that agreed upon amount in full, the lessor rejected the payments without cause. Here, Defendants unilaterally reduced the annual minimum royalty payment, without consultation with or agreement from Hazard Coal (or a court of law) and without support, other than Mr. Smith's "cursory review." Hazard Coal rejected that payment on the grounds that it was not in compliance with the Lease terms. As

explained above, Hazard Coal was correct in its calculations of the annual minimum royalty, and Defendants' tendered payment was deficient.

The facts in this case are also distinguishable from *Kycoga Co., LLC v. Chesapeake Appalachia, LLC*, No. 15-65, 2016 WL 10805744, at *3 (E.D. Ky. Dec. 28, 2016), another case cited by Defendants. In that case, the lessee routinely paid the monthly royalty payments required under its gas lease, until one month when its check was returned as undeliverable. *Id.* After that, the lessee made some payments and missed others until it finally received written notice from the lessor that the lessor considered the lease surrendered due to nonpayment. *Id.* The lessee then cured its default and continued to make regular payments as required under the lease. *Id.* Then, the lessor filed suit alleging fraud due to discrepancies in the lessee's royalty calculations and seeking to terminate the lease due to the past missed royalty payments, among other reasons. *Id.*

The Court ultimately granted summary judgment in favor of the lessee. The Court first noted that, "[u]nder Kentucky law, in the event of nonpayment of royalties, a lease at most permits an unpaid lessor to seek to recover a deficiency, rather than forfeit the lease, absent clear language to the contrary." *Id.* at *3 (quoting *Hayes* 266 F.3d at 567) (internal citation marks omitted). The gas lease at issue in *Kycoga* did not contain "clear language" allowing for forfeiture in the event of missed royalty payments. *Id.* And regardless, the Court explained, the lessor accepted the cure payment and the subsequent royalty payments. *Id.* Thus, the lessor had waived any opportunity to claim forfeiture. *Id.* at *3–4.

By contrast, in this case, Section 12 of the Lease clearly states that, if the lessee fails to pay the required royalties within sixty days of the due date, the lessor could "at its option, terminate and cancel this lease and all rights created hereunder by giving written notice by

- 31 -

Certified Mail to Lessee *of its intention to declare the rights and privileges herein forfeited*."
[44-2, p. 20 (emphasis added)]. Section 12 further provides the lessee "30 days . . . within which
to remedy or cure its default." *Id.* If the lessee remedies or cures the default within that time
period, the Lease continues uninterrupted. *Id.* However, "[i]f the Lessee fails to remedy or cure
its default within said period of time, the rights and privileges granted hereunder shall cease," at
which point the Lease "shall become null and void and of no further effect." *Id.* Thus, there is
clear language warning the lessee that the lessor may seek to terminate the Lease in the event the
lessee fails to pay its royalties. Hazard Coal pointed to this language in its April 2020 letter
rejecting ARC's deficient $50,000 payment. [R. 45-4]. Further, with respect to the 2019 royalty
payment, Hazard Coal rejected Defendant's deficient payment and therefore has not waived its
right to challenge that nonpayment.

The Court acknowledges that "[e]ven when the lease's terms do expressly permit
forfeiture, '[t]he least-favored of all forfeitures are those founded upon mere delay in the
payment of money.'" *Kycoga*, 2016 WL 10805744, at *3 (quoting *Hayes*, 266 F.3d at 567). The
Court further acknowledges Defendants' contention that, in some cases, a good faith effort to
satisfy one's obligations under a lease may, under certain circumstances, allow the breaching
party to avoid forfeiture. *See Carrs Fork Corp. v. Kodak Mining Co.*, 809 S.W.2d 699, 702 (Ky.
1991) (reversing trial court's termination of lease, which resulted from a "grossly inequitable"
arbitration award).  However, the evidence of record indicates the present controversy evolved
from something more than just a delayed, good faith payment.

First, ARC failed to pay the 2019 annual minimum royalty in January 2020, when it first
became due, a fact that Defendants do not dispute. After litigation began in this case, ARC hired
Mr. Smith to conduct "a cursory review of the Hazard Coal Corp Lease areas to determine the

estimated original coal resources, the depletion of resources, and the estimated resources." [R. 45-9, p. 1]. ARC gave him only one page of the Lease, page 12, which referenced the Lease's start date of January 1, 1982, and ARC apparently did not advise Mr. Smith at that time to start his depletion calculations from any other date. [R. 45-10, pp. 3–4]. After Mr. Smith relayed to ARC his initial determination that the coal resources had not been depleted to an amount fifty percent or less than those resources in existence on January 1, 1982, ARC requested that he start his calculations from the 1960 date of the Original Lease. *Id.* at 4–5.

The fact that ARC did not provide Mr. Smith with any information from which he might initially have assumed an earlier start date is important. This indicates that ARC only intended to use that earlier start date after first receiving Mr. Smith's initial analysis (based on the clear commencement date in the Lease of January 1, 1982), under which ARC would have owed the full $100,000 to Hazard Coal.  In other words, ARC initially provided Mr. Smith with only one relevant date: January 1, 1982, as stated on page 12 of the Lease—the only page provided to Mr. Smith. Only when Mr. Smith's calculations with that start date rendered undesirable results did ARC ask Mr. Smith to use the 1960 start date. Then, using these calculations but without citing the 1960 start date they rely on, ARC advised Hazard Coal that it was invoking Section 6 of the Lease and reducing its annual minimum royalty for 2019. Hazard Coal did so, even though Mr. Smith's report clearly stated multiple times that he had performed only a cursory review of the leasehold's coal resources. In other words, Mr. Smith's report did not confirm the quantity of coal reserves on the leasehold; rather, his report was based on a mere cursory review and fell far short of establishing the amount of *proven* coal reserves, as the Lease required. Perhaps this is why ARC did not even bother to attach to its letter Mr. Smith's report of his "cursory review."

The Court finds that this was not, as Defendants claim, a good faith attempt to satisfy ARC's obligations under the Lease.

Further, under the facts of this case, termination of the Lease is not any less appropriate merely because Defendants state that they are now ready and willing to pay the $100,000 royalty fee, if the Court determines that that is the appropriate amount. [R. 50-1, p. 8]. ARC attempted to pay only $50,000 on March 24, 2020, citing Mr. Smith's Engineering Report. [R. 45-3]. ARC was then advised in writing of Hazard Coal's rejection of that partial payment and its intent to terminate the Lease if the full payment was not provided within thirty days. [R. 45-4]. The Lease expressly warns that Hazard Coal, as lessor, may take such action. [R. 44-2, p. 20]. And Hazard Coal made clear in its April 2020 letter that it intended to enforce those express provisions, unless ARC cured its default. *See* [R. 45-4]. Nevertheless, ARC did not offer to pay the $100,000 into an escrow account or otherwise demonstrate its willingness to pay the full amount if and when a court resolved that issue, notwithstanding the fact that this very lawsuit was already before the Court and the parties had previously reached an agreement in the bankruptcy proceeding to deposit earlier disputed payments into an escrow account. Instead, ARC let the cure period expire without action, and now claims that it is ready and willing to pay the full cure amount, if necessary. Under the facts of this case, that offer does not render termination inappropriate.

The Court is also mindful of ARC's conduct in the bankruptcy proceeding. On May 22, 2020, the Bankruptcy Court entered an order addressing the debtors' motion to hold ARC in contempt of court for failing to comply with the Bankruptcy Court's prior orders. [R. 36-9]. That contempt order resulted from ARC's "admitted and ongoing" failures to pay certain liabilities it has assumed in the bankruptcy proceeding. *Id.* at 1, 5–7. The Bankruptcy Court had entered

multiple orders directing ARC to pay these liabilities, and ARC repeatedly violated those orders. *Id.* at 5–7. Each time, ARC admitted its failure to pay, but promised the Bankruptcy Court that it would make the necessary payments. *Id.* As a result of its admissions of liability and promises to pay, ARC and its subsidiary "dodged imminent contempt sanctions." *Id.* at 1. Yet, ARC repeatedly broke its promises and, time and time again, failed to make payments on its liabilities. *Id.* at 5–7. The Bankruptcy Court summarized ARC's behavior as follows:

> ARC has appeared multiple times based on its failure to comply with orders of this Court. Monetary sanctions were imposed, but suspended based on promises to comply with negotiated agreements. ARC continues to refuse to comply with its own agreements, including those that were incorporated into orders. ARC does not deny this, but argues its actions are not egregious and monetary and other sanctions will not help.

*Id.* at 7. The Bankruptcy Court described Defendants' "admissions, but subsequent refusals to live up to their promises to pay" as a running theme in the bankruptcy proceeding. *Id.* at 6.

In considering ARC's good faith argument, the Court cannot ignore the similarities in ARC's behavior in the bankruptcy proceeding and its behavior in the present case. When confronted with its own failure to pay its debts and liabilities, ARC promised on multiple occasions that it would make the necessary payments, apparently to avoid sanctions from the Bankruptcy Court. After avoiding those sanctions, ARC repeatedly failed to live up to its promises. Now, in this Court, ARC promises that it will pay the $100,000 annual minimum royalty if the Court deems that to be the appropriate amount. ARC's past conduct cuts against its argument that it acted in good faith when it failed to tender the full annual minimum royalty.

In sum, the Court has reviewed the evidence of record and finds no genuine dispute of material fact with respect to this specific lease termination issue. The evidence of record demonstrates that ARC breached the Lease by failing to timely pay the full 2019 annual minimum royalty payment when it became due in 2020. After receiving written notice of its

breach and Hazard Coal's intention to terminate the Lease, ARC failed to cure its breach. Under the facts of this case and the express provisions of the Lease, termination of the Lease is appropriate.

### C.  Motion to Exclude Expert Testimony, [R. 45]

As noted above, Hazard Coal has also filed a Motion to Exclude Expert Testimony, specifically asking the Court to exclude the testimony of Mr. Smith. [R. 45]. Hazard argues that Mr. Smith's conclusions, as set forth in his Engineering Report, are inadmissible under Federal Rule of Evidence 702, the Rule governing the admissibility of expert testimony. However, as the Court has already explained, Mr. Smith's report and testimony—even if accepted as a competent expert opinion under Rule 702—do not create a genuine issue of material fact in this case. *See supra* Section II(B)(2)(b). The relevance of Mr. Smith's report is wholly dependent on a 1960 start date for the depletion calculations, as Defendants point out in their own briefing. [R. 49-1]. However, the Court has determined that the appropriate start date is January 2, 1982, the date the Lease commenced. *See supra* Section II(B)(2)(a). Accordingly, the Court will deny Hazard's Motion to Exclude Expert Testimony as moot.

## III.    CONCLUSION

For the reasons set forth above, the Court finds it appropriate to adjudicate the specific lease termination issue outlined in Hazard's Motion for Summary Judgment, [R. 44]. Having reviewed the parties' arguments on that issue, the evidence of record, and the applicable law, the Court finds that there is no genuine issue of material fact with respect to that specific lease termination issue. The evidence of record demonstrates that (1) the appropriate start date for the depletion calculations is January 1, 1982; (2) based upon those calculations, ARC breached the Lease by failing to tender the full annual minimum royalty payment for 2019 and failed to cure

that breach after written notice; and (3) termination of the Lease is appropriate under the facts of this case. This analysis remains intact even assuming that Mr. Smith's challenged report qualifies as an expert report under Rule 702.

Accordingly, **IT IS HEREBY ORDERED** as follows:

1. Hazard Coal's Motion for an Adjudication of the Lease Termination Issue in the Pending Motion for Summary Judgment and Supporting Memoranda and to Hold the Remaining Issues in Abeyance Pending the Outcome of the Related Appeal, [**R. 65**], is **GRANTED**.

2. Hazard Coal's Motion for Summary Judgment, [**R. 44**], is **GRANTED** with respect to the specific issue of whether Defendants breached the Lease by failing to pay the 2019 annual minimum royalties that became due in 2020, thereby resulting in termination of the Lease.

3. Hazard Coal's Motion to Exclude Purported Expert Testimony of Richard Dirk Smith ("Motion to Exclude Expert Testimony"), [**R. 45**], is **DENIED as moot.**

4. Hazard Coal's Motion in Limine, [**R. 68**], is **DENIED**. To the extent the Motion in Limine seeks exclusion of the report and testimony of Richard Dirk Smith, it is **DENIED as moot**. To the extent the Motion in Limine seeks exclusion of matters not covered by this Memorandum Opinion and Order, it is **DENIED WITHOUT PREJUDICE**, in light of this Court's order remanding the trial date, [R. 78].

5. Upon entry of this Memorandum Opinion and Order, all remaining matters in this case, including implementation of this Order, are **STAYED** pending resolution of Hazard Coal's appeal of the Bankruptcy Court's January 22, 2021 order.

This the 30th day of September, 2021.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY