UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| HAZARD COAL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6:20-CV-010-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| AMERICAN RESOURCES | ) | **AND ORDER** |
| CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on several motions. First, Defendants American Resources Corporation and Perry County Resources, LLC (collectively, "ARC") filed a Motion to Strike Testimony of Plaintiff's Proposed Expert Witness Edward Harris Greenwald, Jr. ("Motion to Strike Greenwald"), [R. 154], and a Motion to Strike Testimony of Plaintiff's Proposed Expert Witness James Steven Gardner ("Motion to Strike Gardner"), [R. 155]. Plaintiff Hazard Coal Corporation ("Hazard Coal") responded to both motions, [R. 157], [R. 160], and ARC replied. [R. 161]; [R. 166]. Hazard Coal then filed its Motion for Summary Judgment Declaring that Hazard Coal is the Owner of the Coal Handling Facilities ("Motion for Summary Judgment"), [R. 156], which has been fully briefed. [R. 165]; [R. 167]. ARC next filed a Motion to Join Continental Heritage Insurance Company to This Action in Order to Respond to the Plaintiff's Motion for Summary Judgment, Pursuant to Federal Rule of Civil Procedure 19(A) ("Motion to Join Continental Heritage"), [R. 162]. ARC also filed a Motion to Join the Liquidating Trustee of the Cambrian Liquidating Trust to This Action in Order to Respond to the Plaintiff's Motion for Summary Judgment, Pursuant to Federal Rule of Civil Procedure 19(A) ("Motion to Join

Liquidating Trustee"), [R. 163]. Hazard Coal responded to both motions. [R. 168]; [R. 169]. ARC replied. [R. 171]; [R. 172]. Next, ARC filed a Motion to Refer Plaintiff's Motion for Summary Judgment Regarding the Ownership of the Coal Handling Facilities to the US Bankruptcy Court for Resolution Pursuant to the Bankriptcy (sic) Court's Sale Order ("Motion to Refer"), [R. 164]. Hazard Coal has responded in opposition, [R. 170], and ARC replied, [R. 173]. Finally, ARC filed a Motion to Supplemnt (sic) the Record Relating to the Plaintiff's Motion for Summary Judgment Regarding the Ownership of the Coal Handling Facilities ("Motion to Supplement"), [R. 174]. Hazard Coal has responded in opposition, [R. 175], and ARC replied, [R. 176]. Accordingly, these motions are fully briefed and ripe for review.

For the reasons set forth below, the Court will grant the Motion for Summary Judgment, [R. 156], and deny the remaining motions, [R. 154]; [R. 155]; [R. 162]; [R. 163]; [R. 164]; [R. 174].

## I. BACKGROUND

The Court provided a thorough recitation of the facts of this case in its prior Memorandum Opinion and Orders. [R. 81]; [R. 110]; [R. 118]. Here, the Court provides a summary of the most relevant factual and procedural background.

### A. The Lease Agreements and the Coal Handling Facilities

In 1960, Hazard Coal, as lessor, entered into an agreement by which it leased certain coal property to Elmer Whitaker, lessee. [R. 81, p. 2]; [R. 156-2 (1960 Lease)]. Per that agreement, Mr. Whitaker was granted the right to mine and remove coal from certain coal seams on Hazard Coal's property in Perry County, Kentucky. [R. 156-2, p. 1]. Mr. Whitaker, as lessee, was also required to, among other things, "maintain a strictly modern plant." *Id.* at 2.

Page six of that 1960 Lease also provided that Hazard Coal owned certain property but agreed to sell some of it, namely, "all of the spare parts and mining equipment," to the lessee. [R. 156-2, p. 6]. The agreement further explained that other property owned by Hazard Coal, such as "the tipple complete with everything used therewith, all mine rail, trolley wire and the shop are to remain the property of" Hazard Coal and "are not part of the property sold to the Lessee." *Id.* The parties further agreed that the lessee would pay to the lessor five cents per ton for any other coal brought over the lessor's property "or put through Lessor's tipple." *Id.*

Over the years, that lease agreement was amended several times, adding additional coal acreage and seams, and Mr. Whitaker ultimately assigned part of his interest to Whitaker Coal Corporation. [R. 81, p. 2]; [R. 44-2, p. 1 (Lease, discussing Original Lease)]; [R. 178-1 (July 8, 1960 Whitaker Coal Assignment)]. That 1960 lease agreement, and all amendments and supplements occurring prior to February 7, 1978, are referred to as "the Original Lease." [R. 44-2, p. 1].

On June 28, 1977, Hazard Coal's board of directors met and discussed the need for clarification of the various agreements. *See* [R. 178, p. 3]; [R. 178-3 (June 28, 1977 Meeting Minutes)]. The minutes from that meeting reflect that "[a] discussion was held regarding the Hazard Coal Corporation's property under lease to Mr. Elmer Whitaker with the purpose of clarifying said lease dated 8th of July 1960 along with letters adding additional acreage at different dates after said date of original lease." [R. 178-3, p. 1]. Mr. Whitaker explained to the board "that the letters involved were not completely clear as to what coal acreage and seams were involved, and he would like to have an agreement drawn stating clearly as to what coal acreage and coal seams are under lease." *Id.* The board of directors agreed to review the various lease and letter agreements and maps and discuss the matter at a subsequent meeting. *Id.*

- 3 -

On February 7, 1978, the board of directors met again and granted a motion "that Hazard Coal Corporation enter into a lease with Whitaker Coal Corporation." [R. 178-4, p. 2 (Feb. 7, 1978 Meeting Minutes)]. The terms of that lease agreement are included in the meeting minutes. *Id.* at 2–15 (hereafter, "1978 Lease"). Those minutes also include the clarification agreement requested by Mr. Whitaker.[1] The parties refer to this as the 1978 Lease Clarification Agreement.

Relevant here, the 1978 Lease Clarification Agreement acknowledges that "the Lessee, his heirs and assigns, . . . have made substantial improvements upon the property of the Lessor, and are now in the process of making additional substantial improvements at great financial cost." [R. 178-4, p. 7]. The agreement goes on to state that, "in consideration of the premises and the mutual covenants and conditions herein contained, and in the further consideration of the Lessee, his heirs and assigns, making substantial improvements upon the surface of the leased property in reliance upon this Clarification Agreement," the parties agreed to certain provisions. *Id.* at 7–8. Among other things, Hazard Coal "confirms and reiterates, and further gives, grants, lets and demises unto the Lessee, his heirs and assigns, with respect to all and/or any part of the" coal seams and acreages covered under the agreement,

> [t]he right, permission, authority and/or license to construct, operate, use and maintain upon the surface and/or subsurface of the tracts described above at such places and in such manner as the Lessee, his heirs or assigns, may deem necessary or convenient, tipples; washing, processing and/or cleaning plants; roads; buildings; stockpiles; telephone and/or telegraph lines; electric transmission lines; power houses; shops; chutes; picking tables; crushers; sediment basins; washing, processing and/or cleaning machinery and/or equipment; and place, locate and maintain other machinery and equipment upon said land.

*Id.* at 9–10.

---

[1] It is the Court's understanding that the 1978 Lease begins on page 2 of the minutes and consists of Paragraphs 1 through 3 (with subparts). [R. 178-4, pp. 2–5]. Then, on page 5, the minutes explain that, "[a]long with the above lease the motion [at the meeting] included that a separate lease clarification agreement be entered into . . . whereby the following agreement would be entered into this day," and it then goes on to recite the terms of the Lease Clarification Agreement, which consists of its own Paragraphs 1 through 12 (with subparts). *Id.* at 5–15.

The current president of Hazard Coal, Jack E. Whitaker, discusses the 1978 Lease Clarification Agreement in an affidavit. *See* [R. 156-25, ¶ 21 (J. Whitaker Affidavit)]. As he explains, "stringent environmental regulations" in the 1970s created "a demand for higher quality coals," and as a result, the parties "began investigating the cost and nature of facilities that would be needed." *Id.* ¶ 31. The need for such facilities, in turn, led to Whitaker Coal Corporation's construction of certain coal processing/washing, storage, loadout and related facilities. *Id.* ¶¶ 30, 31. In his affidavit, Mr. Jack E. Whitaker states that these various items "encompass the coal processing/washing, storage, loadout and related facilities" now known as the Coal Handling Facilities.[2] *Id.* ¶ 30. With the construction of these Coal Handling Facilities came the Lease Clarification Agreement. *Id.* ¶ 32.

In 1981, Hazard Coal entered into an agreement ("the Lease") by which it again leased certain coal property and coal seams to Whitaker Coal Corporation. [R. 81, p. 2]; [R. 44-2]. That Lease described the Original Lease, [R. 44-2, p. 1], and explained that the Original Lease and subsequent agreements, including the 1978 Lease Clarification Agreement, "are merged into this agreement and to the extent the terms and conditions of those agreements may conflict with this agreement, this agreement controls." *Id.* at 23, ¶ 21.

Relevant here, the Lease provides for cancellation and termination of its terms under certain circumstances, such as the failure to pay annual royalties. *Id.* at 19–21. The Lease further provides in Paragraph 16 that, upon its termination,

> Lessee shall have the right to enter upon the property covered hereunder and to remove therefrom all equipment, machinery, supplies, tracks, structures, tipples, cleaning plants, washing plants, tanks and other items of personalty and all fixtures owned by Lessee, and all mined and stored coal, provided that all sums due and owing to Lessor under the terms hereof shall have been paid.

---

[2] The parties do not dispute that these various structures and facilities constitute the Coal Handling Facilities at issue.

*Id.* at 21, ¶ 16.

Perry County Coal, LLC ("Perry County Coal") eventually assumed Whitaker Coal Corporation's interest in the Lease. [R. 81, p. 2]; [R. 44-3, ¶ 4]; [R. 44-2, pp. 6–9].

### B. The Bankruptcy Proceedings and The Present Lawsuit

In 2019, Perry County Coal's parent company, Cambrian Holding Company, Inc. ("Cambrian Holding") and eighteen related entities filed voluntary Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the Eastern District of Kentucky, which were jointly administered. [R. 81, p. 5]; [R. 61-2, p. 2]. Through that bankruptcy proceeding (hereafter, "the Cambrian Holding Bankruptcy"), Perry County Coal's assets, including its interest in the Lease, were sold to ARC. [R. 81, p. 6]; [R. 44-8, p. 1]. On September 25, 2019, the Bankruptcy Court entered a Sale Order approving of the sale of the debtors' assets and the assumption and assignment of the debtors' contracts, including the Lease. [R. 81, p. 7]; [R. 36-6]; [R. 36-7].

Attached to the Sale Order was a General Assignment and Assumption Agreement and Bill of Sale ("Bill of Sale") between the debtors and ARC. [R. 36-7, pp. 58–64]. That Bill of Sale defined the "Purchased Assets," or in other words, the assets sold to ARC, as follows:

> The Purchased Assets are all leases, interests in real property, contracts, governmental permits and/or authorizations . . . , improvements, equipment, parts, and inventory, coal inventory, all deposits (including, but not limited to, insurance and utility deposits), maps, electronic files, records and employee information (to the extent permitted by law) which are (a) necessary and desirable for the operation of the Perry County Operations as such operations would be operated by an experienced and prudent operator, and (b) owned and leased by [the sellers, including Perry County Coal] with respect to the Perry County Operations. The Purchased Assets also include any real property, improvements, leases, equipment, parts and inventory and coal inventory located within the Perry County Operations whether or not contained within, on, or under the [mining] permits listed [in the Bill of Sale].

*Id.* at 65 (Exhibit A to Bill of Sale).

Hazard Coal then made several challenges to the Sale Order in different forums. [R. 81, p. 8]. Among other things, Hazard Coal sought a declaratory judgment from the Bankruptcy Court that the Lease terminated prior to the filing of the bankruptcy petitions because Perry County Coal had failed to pay certain royalties due under the Lease, and the Lease was therefore not a part of the bankruptcy estate. *Id.*; [R. 61-2, p. 2]. Hazard Coal also asked the Bankruptcy Court to reconsider its Sale Order. [R. 81, p. 8]; [R. 61-2, p. 2]. On January 3, 2020, the Bankruptcy Court entered an order that denied Hazard Coal's motion for reconsideration and explained that the Lease was properly included in the bankruptcy estate and Hazard Coal's claims were barred by the doctrine of res judicata. [R. 81, p. 9]; [R. 61-2].

Hazard Coal then filed suit in state court on January 16, 2020, and ARC promptly removed the matter to this Court. [R. 81, p. 10]; [R. 1-1]. In an Amended Complaint filed February 5, 2020, Hazard Coal asserted the following claims: breach of the Lease, waste, abandonment, breach of the implied covenant of good faith and fair dealing, and a claim for injunctive relief. [R. 15]. With respect to Count I for breach of the Lease, Hazard Coal alleged that, after the bankruptcy sale, ARC breached the Lease by failing to pay the 2019 annual minimum royalties that became due on or about January 1, 2020. *Id.* at ¶ 23.

On March 24, 2020, ARC tendered to Hazard Coal a check for $50,000 for those 2019 annual minimum royalties. [R. 45-3]. ARC explained that, that, pursuant to the terms of the Lease, the lessee could "adjust the annual minimum royalty due to Hazard Coal based on coal reserves that are diminished or depleted within the Hazard Coal Lease." *Id.* Perry County Resources then explained that a professional engineer had determined that the coal reserves within the leasehold had been depleted by approximately fifty-two percent. *Id.* Thus, Defendants had tendered only $50,000. *Id.* On April 9, 2020, Hazard Coal, rejecting ARC's explanation, provided written notice

of ARC's default under the Lease for failure to pay the full $100,000 amount and Hazard Coal's intent to terminate the Lease. [R. 45-4]. Under the terms of the Lease, ARC had thirty days from the date of that written notice to cure its default. [R. 44-2, p. 20]. ARC failed to do so.

On August 10, 2020, Hazard Coal filed a Motion for Temporary Restraining Order, [R. 39]. Specifically, Hazard Coal sought to enjoin ARC from "demolishing and/or removing improvements from the" leasehold, including "coal washing, processing, stacking, handling and loadout facilities." *Id.* at 1, 2. Hazard Coal argued that ARC had begun demolishing certain improvements on August 10, 2020. *Id.* at 2. However, Hazard Coal argued, ARC had breached the Lease by failing to pay its 2019 annual minimum royalties, and as a result, it had no right to enter the leasehold or demolish or remove any improvements. *Id.* ARC responded, acknowledging that it had removed and was in the process of removing certain scrap metal and unused structures. [R. 41]; [R. 41-2 p. 2 (Memorandum)]. ARC argued, without explanation or citation to evidence or authority, that it owned the improvements on the property and as a result, it could remove those improvements at any time.[3] [R. 41]; [R. 41-2, pp. 1–2]. It also argued that, even assuming the Lease terminated for failure to pay the 2019 annual minimum royalties, it was permitted to remove the improvements under Paragraph 16 of the Lease. [R. 41-2, pp. 3–4]. In that response brief, ARC quoted to Paragraph 16, which, as stated above, allows the lessee to remove certain items upon termination of the Lease; however, ARC failed to quote or address Paragraph 16's requirement that "all sums due and owing to Lessor under the terms [of the Lease] shall have been paid." *Id.* Nevertheless, ARC clarified that it had no intention of removing any of the operational improvements from the leasehold. *Id.* at 2. On August 18, 2020, the Court denied the Motion for

---

[3] ARC cited to an affidavit of its Chief Executive Officer, but that affidavit did not explain why ARC believed it owned the improvements. *See* [R. 41-1].

Temporary Restraining Order, explaining that Hazard Coal had failed to make a substantial showing of irreparable harm. [R. 43].

In the interim, ARC sought clarification from the Bankruptcy Court. [R. 81, p. 14; R. 58-2]. On January 22, 2021, the Bankruptcy Court entered an order (hereafter, the "Declarations Order") clarifying its January 3, 2020 Order, in which it had denied Hazard Coal's motion seeking reconsideration of the Sale Order. [R. 58-1]. That January 3, 2020 Order, the Bankruptcy Court explained, "confirm[ed] the Debtor's assumption of the Lease and assignment to [ARC]," as authorized by the Sale Order. *Id.* at 13. Hazard Coal appealed this Declarations Order. [R. 59].

Meanwhile, Hazard Coal filed a Motion for Summary Judgment in this Court. [R. 44]. Among other things, Hazard Coal sought judgment on its breach of the Lease claim, in which Hazard Coal argued that the Lease was terminated by its own terms when ARC failed to pay the 2019 royalties. *Id.* The parties agreed that the Declarations Order did not affect this specific question. [R. 81, pp. 15–16; R. 61; R. 62]. Hazard Coal asked the Court to adjudicate that sole issue and hold all the remaining issues in abeyance pending its appeal of the Declarations Order. [R. 65]. The Court granted that request. *See* [R. 81, pp. 17–18].

On September 30, 2021, the Court entered its Memorandum Opinion and Order granting summary judgment in favor of Hazard Coal on the specific issue of whether ARC breached the lease at issue in this case by failing to pay the 2019 annual minimum royalties, thereby resulting in termination of that lease. [R. 81]. The Court concluded that "ARC breached the Lease by failing to timely pay the full 2019 annual minimum royalty payment when it became due in 2020," it "failed to cure its breach" after receiving written notice, and "termination of the Lease is appropriate." *Id.* at 35–36. The Court also stated that "[u]pon entry of this Memorandum Opinion and Order, all remaining matters in this case, including implementation of this Order, are

**STAYED** pending resolution of Hazard Coal's appeal of the Bankruptcy Court's January 22, 2021 order." *Id.* at 37. ARC thereafter filed a Motion to Alter, Amend or Reconsider the Court's September 30, 2021 Memorandum Opinion and Order. [R. 82].

On September 9, 2022, Judge Karen Caldwell issued an order in the bankruptcy appeal case, affirming the Bankruptcy Court's Declarations Order. *Hazard Coal Corporation v. Cambrian Coal LLC*, No. 5:21-cv-40-KKC (E.D. Ky. Sept. 9, 2022), ECF No. 26. On the same day, this Court entered its order denying ARC's Motion to Alter, Amend or Reconsider. [R. 99]. Shortly thereafter a motion for rehearing was filed in the bankruptcy appeal, and a notice of appeal was filed in this case, appealing both the September 30, 2021 Memorandum Opinion and Order and the September 9, 2022 order denying the motion to reconsider. [R. 101]. The appeal was ultimately dismissed for lack of jurisdiction, [R. 108], and the motion for rehearing in the bankruptcy appeal was denied. *See* No. 5:21-cv-040-KKC, ECF No. 33. Hazard Coal then appealed Judge Caldwell's order denying the motion for rehearing and her earlier order affirming the Bankruptcy Court's Declarations Order. *Id.* at ECF No. 34. The Sixth Circuit has since affirmed Judge Caldwell's rulings. *Id.* at ECF No. 38.

Meanwhile, this Court addressed a motion by Hazard Coal to certify the September 30, 2021 Memorandum Opinion and Order as final and appealable, thereby permitting an interlocutory appeal, lift the stay, and enter an injunction against ARC. [R. 103-1]. On September 27, 2023, the Court denied the request to certify its September 30, 2021 ruling, granted the request to lift the stay, and denied the motion for injunctive relief. [R. 110].

After a follow-up status conference on October 31, 2023, the Court allowed Hazard Coal time to file a renewed motion for summary judgment on ARC's counterclaim for tortious interference. [R. 112 (Minutes from Status Conference)]; *see also* [R. 117 (Transcript)]. Hazard

Coal filed its Renewed Motion for Summary Judgment on Defendant's Counterclaim on December 15, 2023. [R. 113]. The Court ultimately granted the motion. [R. 118].

Shortly thereafter, Hazard Coal filed an Emergency Motion for Appointment of Receiver Over Hazard Coal's Property ("Emergency Motion"). [R. 121]. The Court held an evidentiary hearing on the motion on November 13, 2024, at which it heard testimony and admitted exhibits. [R. 137]. However, Hazard Coal ultimately moved to hold the Emergency Motion in abeyance. *Id.* The parties also raised the possibility of submitting summary judgment motions on the limited issue of which party owns the Coal Handling Facilities on the subject property. *Id.* The Court granted that request to hold the Emergency Motion in abeyance, *id.*, and also granted the parties' request to engage in limited discovery and submit summary judgment motions on the ownership issue now before the Court. [R. 140].[4]

Hazard Coal has since filed its Motion for Summary Judgment Declaring that Hazard Coal is the Owner of the Coal Handling Facilities ("Motion for Summary Judgment"), [R. 156], which is fully briefed. [R. 165 (Response)]; [R. 167 (Reply)]. According to Hazard Coal, it has always owned the Coal Handling Facilities, as evidenced by the plain and unambiguous language in the various lease agreements. *See* [R. 156-1, pp. 14–18]. Furthermore, to the extent that the lease agreements do not resolve the ownership issue, Hazard Coal argues that the Coal Handling Facilities are fixtures and are therefore part of the real property owned by Hazard. *Id.* at 18–24. Hazard Coal also argues that, even if ARC owned the Coal Handling Facilities, it has not paid "all sums due and owing" under Paragraph 16 of the Lease, and it is therefore not entitled to remove the property. [R. 156-1, p. 15].

---

[4] The Court eventually denied the Emergency Motion without prejudice after the parties filed certain agreed orders addressing the issues raised in that motion. [R. 146].

In response, ARC argues that Perry County Coal, as the previous lessee, owned the Coal Handling Facilities, citing Paragraph 16 of the Lease. [R. 165, p. 4, 7]. According to ARC, it then purchased those Coal Handling Facilities in the bankruptcy proceeding, as evidenced by the definition of "Purchased Assets" referenced in the Sale Order. *Id.* at 2–8. As a result, ARC argues, the classification of the Coal Handling Facilities as "fixtures" is irrelevant.

In reviewing these arguments and the record, the Court found several of the lease agreements and assignments referenced in the parties' briefing and in Mr. Jack E. Whitaker's affidavit, [R. 156-25], to be missing from the record. To ensure a fully developed record, and because the parties repeatedly referenced those agreements and assignments, the Court ordered Hazard Coal to file copies of those documents in the record. [R. 177]. Hazard Coal did so, [R. 178-1]; [R. 178-2]; [R. 178-3]; [R. 178-4]; [R. 178-5], and the Court ultimately allowed ARC an opportunity to respond to the newly filed documents. [R. 181]. ARC filed its response, [R. 182], stating that it had "no response to the documents." *Id.* at 2. Given this lack of a response, Hazard Coal replied that it was "without notice/knowledge of an issue to which it needs to reply." [R. 183, p. 2].

Before turning to the parties' arguments, the Court will first address ARC's Motions to Join, [R. 162], [R. 163], Motion to Refer, [R. 164], Motion to Supplement, [R. 174], and the two motions seeking to strike Plaintiff's proposed expert witnesses, [R. 154]; [R. 155].

## II. ANALYSIS

### A. Requests for Hearing

In its various responses, Hazard Coal requests a hearing on each of ARC's motions. *See* [R 168]; [R. 169]; [R. 170]; [R. 175]. The Court does not believe that a hearing is necessary, nor would such a hearing aid the Court in the resolution of these various motions. For the reasons set

forth herein, these matters may be resolved on the record, without oral argument. Accordingly, the Court declines to hold a hearing on these matters.

### B.  Motion to Refer, [R. 164]

In its Motion to Refer, ARC asks the Court to refer Hazard Coal's Motion for Summary Judgment to the United States Bankruptcy Court for the Eastern District of Kentucky. [R. 164]. First, ARC cites to 28 U.S.C. § 1334(b) and argues that the Bankruptcy Court retains "arising in" jurisdiction to determine whether its Sale Order has preclusive effect under the doctrines of collateral estoppel or res judicata. *Id.* at 3–4. Section 1334(b) states that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b) (emphasis added). If a district court has bankruptcy jurisdiction under this provision, then it may refer the matter to a bankruptcy judge under 28 U.S.C. § 157(a). *See SWM Properties Incorporated v. Androla*, 3:17-CV-00271-TBR, 2017 WL 4553412, at *2 (W.D. Ky. Oct. 12, 2017).

Next, ARC cites to the Sale Order, specifically Paragraph 36, which states in full,

> The Bankruptcy Court shall retain exclusive jurisdiction to: (a) interpret, implement and enforce the terms and provisions of this Order and the [Asset Purchase Agreements ("APA")], including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, in all respects; and (b) to decide any disputes concerning this Order and the APAs, or the rights and duties of the parties hereunder or thereunder or any issues relating to the APAs and this Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Assets and any Assigned Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning (i) the transfer of the assets free and clear of all Liens and (ii) the absolute conveyance of the Assumed Liabilities and Assigned Contracts.

R. 164-2, pp. 22–23, ¶ 36 (Sale Order)]. From this, ARC argues that the Bankruptcy Court "retained exclusive jurisdiction to interpret the Sale Order to decide what assets were included within the 'Purchased Assets' sold to [ARC]." [R. 164, p. 4].

As noted above, ARC's arguments regarding the ownership of the Coal Handling Facilities focuses primarily on the Sale Order and its definition of "Purchased Assets." *See, e.g.*, [R. 164-1 pp. 2, 5].[5] ARC points out that the definition of "Purchased Assets" includes "all leases, interests in real property, . . . improvements, [and] equipment," and from this, argues that ownership of the Coal Handling Facilities were transferred to ARC. *Id.*; *see also* [R. 36-7, pp. 58–64 (Bill of Sale, defining "Purchased Assets")]. As such, ARC argues, "resolution of this [ownership] issue will require the U.S. Bankruptcy Court to review and interpret the Sale Order to determine whether or not the Coal Handling Facilities were in fact sold to the Defendants."[6] [R. 164-1, p. 5]. But this argument puts the cart before the horse. The commencement of a bankruptcy case "creates an estate . . . comprised of," among other things, "all legal or equitable interests of the debtor in property *as of the commencement of the case*." 11 U.S.C. § 541(a)(1) (emphasis added). This includes "[e]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative." *In re Blasingame*, 986 F.3d 633, 638 (6th Cir. 2021) (quoting *Tyler v. DH Capital Mgmt., Inc.*, 736 F.3d 455, 461 (6th Cir. 2013)) (internal quotation marks omitted). This includes any interest in a leasehold, even if disputed. *See* [R. 61-2, pp. 8–10 (Bankruptcy Court's Jan. 3 Order)]. But importantly, it only includes those interests that the debtor already has "as of the commencement of the case." § 541(a)(1). That is, the Sale Order cannot create ownership rights that did not previously exist. Thus, the ownership issue currently before the Court is resolved not by interpreting or examining the Sale Order, but by looking to the plain language of the Lease

---

[5] To the extent the page number listed on a filing conflicts with the page number assigned by the Court's electronic docketing system, the Court refers to the number assigned by the docketing system.

[6] In its response to the Motion for Summary Judgment, ARC also argues that Hazard Coal has challenged the terms of the Sale Order by arguing that the Coal Handling Facilities are fixtures, not improvements as referenced in the Sale Order. [R. 165, pp. 3, 7]. But ARC has misconstrued Hazard Coal's argument. Hazard Coal argues that, if the written lease agreements do not on their face resolve the ownership issue, the Court can turn to basic principles of property law to determine whether the Coal Handling Facilities are fixtures that remain with the real property. *See* [R. 156-1, pp. 18–24]. That argument does not challenge, nor even require consideration of, the Sale Order.

and its various amendments and supplements to determine what interests Perry County Coal held in the Coal Handling Facilities at the time the bankruptcy proceeding commenced. Moreover, as explained below, Hazard Coal's assertion that it owns the Coal Handling Facilities under the plain language of the various lease agreements does not conflict with the terms of the Sale Order because the "Purchased Assets," as defined in the Sale Order, included assets that were both "owned and leased" by the debtors. *See* [R. 36-7, pp. 58–64 (Bill of Sale, defining "Purchased Assets")]. The Court will therefore deny the Motion to Refer.

### C.  Motions to Join, [R. 162], [R. 163]

ARC has filed two motions seeking to join parties to this suit for the limited purpose of responding to the Hazard Coal's Motion for Summary Judgment. First, ARC seeks to join Continental Heritage Insurance Company ("Continental Heritage"), the reclamation surety on certain reclamation bonds relating to mining permits. *See* [R. 162-1, p. 2]. Those reclamation bonds were required for the issuance of transfer permits to third-party purchasers as part of the Bankruptcy Court sale, and Continental Heritage agreed to be the reclamation surety for those bonds. *Id.* As part of that process, Continental Heritage obtained a first priority lien on certain assets, including those relating to Perry County Coal's bankruptcy estate, which in turn includes certain "improvements" and "equipment," as contemplated by the Sale Order. *See* [R. 36-7, p. 65 (Exhibit A to Bill of Sale, defining "Purchased Assets")]. As noted above, ARC argues that those improvements and equipment include the Coal Mining Facilities, and as a result, Continental Heritage has an interest in the outcome of this ownership issue. [R. 162-1, p. 3]. Thus, ARC argues, Continental Heritage should be joined under Federal Rule of Civil Procedure 19, for the limited purpose of responding to the Motion for Summary Judgment. *Id*. at 3–4.

For similar reasons, ARC seeks to join the Liquidating Trustee of the Cambrian Liquidating Trust. [R. 163]. As ARC explains, the Liquidating Trustee holds the rights to related mining permits, and the Court's decision on the ownership issue "will affect the Liquidating Trustee's ability to market and sell the mining permits to a potential third-party buyer and will substantially affect the Liquidating Trustee's ability to further administer the bankruptcy estate." [R. 163-1, p. 4].

In support of these motions, ARC cites to Federal Rule of Civil Procedure 19(a). *See generally* [R. 162]; [R. 163]. Rule 19 "establishes a three-step analysis for determining whether a case should proceed in the absence of a particular party." *PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 200 (6th Cir. 2001) (citation omitted). First, the Court turns to Rule 19(a) to determine "whether a person is necessary to the action and should be joined if possible." *Id.* (quoting *Soberay Mach. & Equip. Co. v. MRF Ltd., Inc.*, 181 F.3d 759, 763–64 (6th Cir. 1999)). If that party is deemed necessary under Rule 19(a), the Court must next determine if that party "is subject to personal jurisdiction and can be joined without eliminating the basis for subject matter jurisdiction." *Id.* (citations omitted). Then, if the necessary party cannot be joined, the Court "must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b); *see also PaineWebber, Inc.*, 26 F.3d at 197. Rule 19(b) then lists four factors that the Court must consider in evaluating this final step. *See* Fed. R. Civ. P. 19(b)(1)–(4).

Here, ARC cites to Rule 19(a) and states that Continental Heritage and the Liquidating Trustee must be joined because deciding the ownership issue in their absence will impair or impede their ability to protect their interest in the liens and the mining permits, respectively. [R. 162-1, p. 3]; [R. 163-1, p. 4]; *see also* Fed. R. Civ. P. 19(a)(i)(B)(i) ("A person who is subject to service of

process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if . . . that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest."). But beyond citing to the rule itself, ARC does not cite any authority in support of its position, and it wholly fails to engage with the remaining two steps of Rule 19's three-step analysis. The Court therefore finds ARC's arguments to be undeveloped, and it need not consider them further. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") (cleaned up).

Regardless, it is clear from ARC's own briefing that it does not wish to join Continental Heritage or the Liquidating Trustee as *parties*. *See* [R. 171-2, p. 3 ("The Defendants would also point out that they are not requesting that CHIC be added as a party to this proceeding for all issues remaining in this case.")]; [R. 172-1, p. 4 ("The Defendants would also point out that they do not request that the Trustee be added as a party to this proceeding for all issues remaining in this case.")]. Instead, ARC only seeks leave from the Court to allow Continental Heritage and the Liquidating Trustee to file responses to Hazard Coal's Motion for Summary Judgment. *See* [R. 171-1, p. 3 ("The Defendants are simply asking the Court to require [Continental Heritage] to be brought in for the limited purpose of responding to the Plaintiff's Motion for Summary Judgment to protect its security interest in the assets obtained by Defendants pursuant to the Sale Order. . . .")]; [R. 172-1, pp. 4–5 ("The Defendants are simply asking the Court to require the Trustee to be brought in for the limited purpose of responding to the Plaintiff's Motion for Summary Judgment and to protect the Cambrian Liquidating Trusts' interest in the assets obtained

by the Defendant's pursuant to the Sale Order. . . .")]. ARC does not cite any authority to support

this limited request. Moreover, further briefing from Continental Heritage and the Liquidating

Trustee would not assist the Court in resolving the present ownership issue. Accordingly, the Court

will deny ARC's Motions to Join. [R. 162]; [R. 163].

### D.  Motion to Supplement, [R. 174]

In its Motion to Supplement, ARC asks for leave to supplement the record with a Schedule

of Assets and Liabilities ("Schedule") relating to Perry County Coal in Bankruptcy Case No. 19-

51217.  [R. 174]; *see also* [R. 174-1]; [R. 174-2]. To this motion, ARC attaches a document from

the Cambrian Holding Bankruptcy titled Global Notes and Statements of Limitations,

Methodology, and Disclaimers Regarding the Debtors' Schedules of Assets and Liabilities and

Statements of Financial Affairs ("Disclaimers"). [R. 174-1]. Also attached are, ostensibly, excerpts

from the Schedule, listing out "Other Machinery, Fixtures, and Equipment (Excluding Farm

Machinery and Equipment)" purportedly owned by Perry County Coal and included within its

bankruptcy estate in Bankruptcy Case No. 19-51217. [R. 174-2]. The excerpts identify a variety

of items, including "Coal Handling Facilities E4-2," "Loadout Facility – BG4," "Loading and

Storage Facility," among others. *Id.* Beyond these bare descriptions and some valuation

information, the Schedule does not provide any other information about the various assets.

ARC explains that, at the time it filed its response to the pending Motion for Summary

Judgment regarding ownership of the Coal Handling Facilities, it had reviewed the bankruptcy

schedules filed in the Cambrian Holding Bankruptcy, but those schedules "were silent as to the

ownership of the Coal Handling Facilities." [R. 174, p. 2]. "However," ARC explains, "because

Bankruptcy Case No. 19-51217 was jointly administered in the Cambrian Holding Bankruptcy,

the schedules of the subsidiary companies, such as Perry County Coal, were not filed in the main

bankruptcy case, but instead were filed in each individual case." *Id.* Now, ARC has reviewed the schedules related to Perry County Coal, filed in bankruptcy case No. 19-51217, "and has determined that the Coal Handling Facilities were listed as owned personal property by Perry County Coal, LLC." *Id.* From this, ARC argues, it is clear that the Coal Handling Facilities at issue were sold to the defendants as part of the bankruptcy sale. *Id.*

Hazard Coal objects to ARC's motion. [R. 175]. Hazard Coal argues that the motion is untimely and will cause unnecessary delay, and the Schedule otherwise has no bearing on the ownership issues raised in the Motion for Summary Judgment.

The Court agrees that the Schedule is unhelpful in resolving the pending summary judgment motion. First, the schedules are prepared by Perry County Coal, as the debtor; they are not findings of the Bankruptcy Court. *See generally* [R. 174-1, p. 1]. Moreover, in the lengthy list of disclaimers, Perry County Coal admits that it may not have characterized its assets correctly. *See, e.g.*, *id.* at 2–3, ¶ 3(b); *id.* at 8–9, ¶ 5(d). And the schedules do not list the Coal Handling Facilities as personal property (or even real property) that is affirmatively *owned* by Perry County Coal. In other words, the schedules do not clearly indicate that the Coal Handling Facilities are owned by Perry County Coal in fee simple, and could just as easily be listed as a *leasehold* asset. *See generally* [R. 174-2]. Lastly, the schedules include items that are "fixtures," which in turn would be part of the real property that was clearly *not* owned by Perry County Coal. *See generally id.* Simply put, the schedules do nothing to demonstrate the nature of Perry County Coal's interest in the Coal Handling Facilities (whether owned in fee simple or a leasehold interest), and they cannot and do not override the provisions of the Lease and its various supplements. As such, the Court will deny the Motion to Supplement.

### E. Motions to Strike, [R. 154], [R. 155]

ARC next seeks to strike the testimony and opinions of Hazard Coal's proposed expert witnesses, Edward Harris Greenwald, Jr. and James Steven Gardner. [R. 154]; [R 155]. As to both experts, ARC argues that their testimony and opinions are "completely irrelevant to the [ownership] issues pending before the Court and [are] not in compliance with the Scheduling Orders entered by the Court." [R. 154, p. 1]; [R. 155, p. 1]. However, ARC filed these motions before Hazard Coal filed its Motion for Summary Judgment. [R. 156]. In its summary judgment motion, as discussed in more detail below, Hazard Coal argues in the alternative that the Coal Handling Facilities are fixtures and as such, they are owned by Hazard Coal. *See* [R. 156-1, pp. 18–24]. To resolve that fixtures question, Hazard Coal urges the Court to consider whether the facilities can be removed without damaging the mine and whether doing so would greatly depreciate the value of the mine, among other things. *Id.* Thus, in response to ARC's Motions to Strike, Hazard Coal argues that the opinions of Mr. Greenwald and Mr. Gardner, which discuss the value of the Coal Handling Facilities and the cost of removal and replacement, are relevant to the fixtures issue. *See* [R. 157]; [R. 160]. Additionally, Hazard Coal argues that these expert disclosures were timely under the Court's order allowing for limited discovery on the ownership issue, a point which ARC appears to concede in its reply briefs. *See* [R. 161]; [R. 166].

From these arguments and the summary judgment briefing, the Court understands that the proposed expert opinions speak only to the fixtures issue. However, for the reasons set forth herein, the Court need not reach the issue of whether the Coal Handling Facilities qualify as fixtures. Moreover, as explained below, even if the Court addresses the fixtures issues on the merits, the expert witness testimony is not necessary to decide that issue. As such, the Court will deny the Motions to Strike as moot.

### F. Motion for Summary Judgment, [R. 156]

#### 1. Legal Standard

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it first finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 256. Once the moving party satisfies this burden, the non-moving party thereafter must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, the non-movant must do "more than simply show that there is some metaphysical doubt as to the material facts." *Moore v. Philip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Rather, the non-movant "must present significant probative evidence in support of its complaint to defeat the motion for summary judgment." *Id.* (citing *Anderson*, 447 U.S. at 249–50).

Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

### 2.  The Parties' Arguments

In its Motion for Summary Judgment, Hazard Coal first argues that Paragraph 16 of the Lease, the provision allowing the lessee the right to remove certain equipment and fixtures upon termination of the Lease, does not apply here because it requires "all sums due and owing" to Hazard Coal to have been paid. [R. 156-1, pp. 4–5, 15]; *see also* [ R. 44-2, p. 21, ¶ 16]. Because ARC previously failed to pay the annual minimum royalties, *see* [R. 81], "all sums due and owing to" Hazard Coal have not been paid. Hazard Coal therefore argues that, to the extent ARC relies on it, Section 16 is irrelevant. [R. 156-1, p. 15]. From this, the Court understands Hazard Coal's argument to be that, even if ARC owned the Coal Handling Facilities at issue, it cannot now remove that property under Paragraph 16.

Regardless, Hazard Coal argues, the plain language of the various lease agreements makes clear that Hazard Coal has always retained ownership of the Coal Handling Facilities. *See id.* at 14–18. The Bankruptcy Court's Sale Order does not alter this, Hazard Coal argues, because "it is axiomatic that the Sellers [in the bankruptcy proceeding] could not sell to ARC what they did not own." *Id.* at 17.  Lastly, Hazard Coal argues that, even if the lease documents themselves do not resolve the ownership issue, the Coal Handling Facilities qualify as fixtures and are thus part of the real property owned by Hazard Coal. [R. 156-1, pp. 18–24].

In response, ARC argues that it "own[s] the Coal Handling Facilities as a result of [the] purchase of those items" through the bankruptcy proceedings. [R. 165, p. 2]. To support this

argument, ARC relies entirely on the Bankruptcy Court's Sale Order and its definition of "Purchased Assets."[7] *Id.* at 2–3. As noted above, that definition included

> all leases, interests in real property, contracts, governmental permits and/or authorizations . . . , improvements, equipment, parts, and inventory, coal inventory, all deposits (including, but not limited to, insurance and utility deposits), maps, electronic files, records and employee information (to the extent permitted by law) which are (a) necessary and desirable for the operation of the Perry County Operations as such operations would be operated by an experienced and prudent operator, and (b) *owned and leased* by [the sellers, including Perry County Coal] with respect to the Perry County Operations. The Purchased Assets also include any real property, improvements, leases, equipment, parts and inventory and coal inventory located within the Perry County Operations whether or not contained within, on, or under the [mining] permits listed [in the Bill of Sale].

[R. 36-7, p. 65 (Exhibit A to Bill of Sale) (emphasis added)]. ARC argues the Coal Handling Facilities "are 'improvements,' equipment' and/or 'are necessary and desirable for the operation of the Perry County Operation as such operations would be operated by an experienced and prudent operator.'" [R. 165, p. 3]. ARC further argues that Hazard Coal's failure to object or appeal the Sale Order renders Hazard Coal's ownership arguments "barred by the legal principles of res judicata and collateral estoppel." *Id.*; *see also id.* at 5. Thus, it argues, "the Sale Order is dispositive on the ownership of the Coal Handling Facilities issue and requires denial of [Hazard Coal's] motion without further inquiry." *Id.* at 3. In addition, ARC argues, Paragraph 16 of the Lease "clearly acknowledges [ARC's] ownership of the Coal Handling Facilities." *Id.* at 4.

### 3.  The Plain Language of the Agreements

The Court, having reviewed each of the various lease agreements and supplements, believes that the plain language of the lease agreements resolves the ownership issue. When interpreting the Lease and its various amendments and supplements, the Court applies the

---

[7] For the reasons already explained, the Court does not consider the documents attached to ARC's Motion to Supplement. [R. 174-1 (Disclaimers)]; [R. 174-2 (Schedule)]. But, even if the Court considered those attachments, as already explained, they would not change the outcome.

substantive law of Kentucky. *Hayes v. Equitable Energy Resources Co.*, 266 F.3d 560, 566 (6th Cir. 2001). Under Kentucky law, the "construction and interpretation of a contract, [like a lease], including questions regarding ambiguity, are questions of law to be decided by the court." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105 (Ky. 2003); *see also Stinler, Inc. v. Mall Road Investors, Ltd. Co.*, No. 2022-CA-1366-MR, 2023 WL 8656204, at *3 (Ky. Ct. App. Dec. 15, 2023).

First, the Court "must begin with an examination of the plain language of the instrument." *Kentucky Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016). An unambiguous contract will be enforced strictly according to its terms by assigning the contract's language its ordinary meaning and without resort to extrinsic evidence. *Frear*, 103 S.W.3d at 106; *Stinler*, 2023 WL 8656204, at *3. Thus, "[w]hen no ambiguity exists in the contract" the Court must "look only as far as the four corners of the document to determine the parties' intentions." *Kentucky Shakespeare Festival*, 490 S.W.3d at 695. In doing so, "[c]ourts will interpret the contract terms by assigning language to its ordinary meaning without resort to extrinsic evidence." *Stinler*, 2023 WL 8656204, at *3 (quoting *Stowe v. Realco Limited Liability Company*, 551 S.W.3d 462, 465–66 (Ky. Ct. App. 2018)) (internal quotation marks omitted).

With these principles in mind, the Court first turns to the language of the Original Lease. Under that agreement, Hazard Coal, as the lessor, leased to Elmer Whitaker "the sole and exclusive right and privilege of mining and removing coal from what is known as . . . the Black Gold lease." [R. 156-2, p. 1]. Page six of the Original Lease also provides,

> It is agreed and understood between the parties hereto that the Lessor is the owner of the tipple, certain railroad sidings or tracts, all of the mining equipment, spare parts, steel, copper wire, shop and other times now located on the premises leased herein and the Lessor has agreed to sell to the Lessee all of the spare parts and mining equipment that is now on the premises for the sum of $42,500.00 which sum is to be paid at the rate of ten (10¢) cents per ton on the coal mind under this lease. . . .

- 24 -

It is understood that the tipple complete and everything used therewith, all mine rail, trolley wire and the shop are to remain the property of the Lessor and are not a part of the property sold to the Lessee for the $42,500.00 above mentioned.

[R. 156-2, p. 6]. Thus, the plain language of the Original Lease makes clear that (1) Hazard Coal, as the lessor, owned "the tipple, certain railroad sidings or tracts, all of the mining equipment, spare parts, steel, copper wire, shop and other times" located on the premises at the time the Original Lease was signed; (2) Hazard Coal agreed to sell to the lessee "all of the spare parts and mining equipment" located on the premises at that time; and (3) Hazard Coal did not agree to sell "the tipple complete and everything used therewith, all mine rail, trolley wire and the shop," and instead, it retained ownership over that property. *See id.*

While the Original Lease makes clear which parties owned these various articles at the time the Original Lease was signed in 1960, it does not expressly address which party, the lessor or lessee, would own future improvements to the property, like the Coal Handling Facilities. The 1978 Lease and Lease Clarification Agreement provide guidance on that issue, however.

As already explained, the 1978 Lease and Lease Clarification Agreement are recited within the minutes of the February 7, 1978 Hazard Coal annual meeting. *See* [R. 178-4]. Under the 1978 Lease, Hazard Coal "hereby leases, lets and demises unto" Whitaker Coal Corporation, its successors and assigns, certain seams of coal, "together with the sole and exclusive right of mining, excavating, removing, processing, shipping and marketing the same." *Id.* at 2–3.

The Lease Clarification Agreement then goes on to discuss the Original Lease and its various assignments and amendments. *Id.* at 5–7. For example, it explained that "the Lessor and Lessee entered into a lease agreement on the 8th day of July, 1960 [the Original Lease], by the terms of which the Lessor leased to the Lessee the sole and exclusive right and privilege of mining certain coal underlying that certain tract or parcel of land, . . . *and further leased certain equipment*

- 25 -

*and improvements located on said property.*" *Id.* at 5 (emphasis added). In other words, the Lease Clarification Agreement acknowledged that the Original Lease was for (1) the right to mine coal from certain tracts, which as noted above, includes the Black Gold Lease, and (2) the *right to use certain equipment and improvements* located on the property. This language is wholly consistent with the lessee acquiring a lease interest in the improvements, rather than an ownership interest.

The Lease Clarification Agreement also acknowledged that on July 8, 1960, Elmer Whitaker, as lessee, had "assigned" to Whitaker Coal "all of the right, title and interest he had acquired in and to the 'Black Gold' tipple, and any and all improvements thereon, used in connection with the operation of said tipple, along with rights-of-way, roads and any other surface rights necessary to operate said 'Black Gold' tipple." *Id.* at 6. Thus, the Lease Clarification Agreement acknowledged that, with respect to the Black Gold Lease, Elmer Whitaker assigned his lease interest in the tipple and improvements to Whitaker Coal Corporation. Again, this language is consistent with the lessee acquiring a leasehold interest in the Black Gold "tipple and improvements," not an ownership interest.

The Lease Clarification Agreement went on to discuss each of the assignments and amendments of the Original Lease. This includes a letter agreement dated August 30, 1967, whereby Hazard Coal added "to the mining rights covered" under the Original Lease "certain seams of coal" located on a tract of land known as the Katy Coal Company Lease. *Id.* at 7. The Lease Clarification Agreement ultimately incorporated the Original Lease and its various assignments and amendments and made them "a part of this Lease Clarification Agreement," subject to additional clarifications. *Id.* at 8.

The Lease Clarification Agreement outlined the need for such clarification. It explained, "the Lessee, his heirs and assigns, have been mining under the Original Lease, as supplemented

by the 1960 Letter Agreement and the 1967 Letter Agreement, and have made substantial improvements upon the property of the Lessor, and are now in the process of making additional substantial improvements at great financial costs." *Id.* at 7. The parties therefore desired to "clarify the rights" of the "Lessee and his heirs and assigns under the Original Lease as supplemented by the 1960 Letter Agreement and the 1967 Letter Agreement." *Id.*

Thus, the Lease Clarification Agreement explained, "in consideration of the premises and the mutual covenants and conditions hereinafter contained, *and in further consideration of the Lessee, his heirs and assigns, making substantial improvements upon the surface of the leased property in reliance upon this Clarification Agreement*, it is agreed by and among the parties as follows." *Id.* at 8–9 (emphasis added). The Lease Clarification Agreement then provided in Paragraph 1 that the Original Lease and its amendments and assignments were fully incorporated within the Lease Clarification Agreement, as noted above. *Id.* at 9. Next, in Paragraph 2, Hazard Coal, as the lessor, "confirms and reiterates its lease, let and demise unto the Lessee, his heirs and assigns," the "sole and exclusive right of mining, excavating, removing, processing, shipping and marketing the same, in, or underlying" the tract known as the Black Gold Lease, as well as the Katy Coal Company Lease. *Id.* at 9. Thus, Paragraph 2 "*confirms and reiterates*" Hazard Coal's previous "*lease, let and demise*" of the exclusive right to mine, excavate, remove, process, ship, and market coal on these properties. *Id.* at 9 (emphasis added).

Unlike Paragraph 2, Paragraph 3 of the Lease Clarification Agreement not only "confirms and reiterates" but "further gives, grants, lets and demises" certain rights to the lessee and his heirs and assigns. *See id.* at 9. For example, the lessee is given whatever rights, easements, and privileges may be necessary or convenient to mine the properties, regardless of what mining method the lessee employs. *Id.* at 9, ¶ 3(a). The lessee is given the right to choose which method or methods

- 27 -

of mining it will use to mine and remove the coal. *Id.* at 10, ¶ 3(g). The lessee is also given "[r]ights of ingress, egress, and regress into, upon, over and across" the various leasehold properties, among other things. *Id.* at 9, ¶ 3(b).

> And relevant here, the Lease Clarification Agreement gave the lessee
>
> [t]he *right, permission, authority and/or license* to construct, operate, use and maintain upon the surface and/or subsurface of the tracts . . . tipples; washing, processing and/or cleaning plants; roads; buildings; stockpiles; telephone and/or telegraph lines; electric transmission lines; power houses; shops; chutes; picking tables; crushers; sediment basins; washing, processing and/or cleaning machinery and/or equipment."

*Id.* at 9, ¶ 3(c) (emphasis added). It further gave the lessee the right to "place, locate and maintain other machinery and equipment upon said land." *Id.* at 9–10, ¶ 3(c). The parties do not dispute that these provisions reference the Coal Handling Facilities.

The plain language of these various provisions makes clear that, in exchange for the "substantial improvements" made by the lessee, i.e., the Coal Handling Facilities, Hazard Coal, as the lessor, not only confirmed and reiterated the lessee's exclusive right to mine, excavate, remove, process, ship, and market coal from the Black Gold Lease and the Kate Coal Company Lease, but it also clarified and gave new rights to the lessee. *See id.* at 9, ¶ 3 (". . . hereby confirms and reiterates, and further gives, grants, lets and demises . . ."). This included the right to "construct, operate, use and maintain" the Coal Handling Facilities. Simply put, in exchange for the Coal Handling Facilities, Hazard Coal would allow the lessee the exclusive right to construct and use such facilities during the term of the lease. While the language does not explicitly state that Hazard Coal "owns" the improvements, that point is clear from the language. The rights "confirm[ed]" and "reiterat[ed]" (which were plainly leasehold rights) along with the new right to construct and use the improvements and facilities are all described in the language consistent with a leasehold. For instance, Paragraph 3(c) grants the "right, permission, authority and/or license to construct,

operate, use and maintain" tipples, washing, processing, and cleaning plants, and the like, *id.* at 9, ¶ 3, and Paragraph 2 confirms Hazard Coal's previous "lease, let, and demise." *Id.* at 8, ¶ 2. It is clear from this plain language, then, that Hazard Coal owned (and owns) the Coal Handling Facilities, and the lessee held only the right to construct, operate, use and maintain those structures on Hazard Coal's property. The Lease Clarification Agreement is devoid of any language that grants to the lessee an ownership interest in these improvements.

True, the parties again amended their lease agreement by entering into the present Lease in 1981. That Lease explains that the Original Lease and subsequent agreements, including the 1978 Lease Clarification Agreement, "are merged into this agreement and to the extent the terms and conditions of those agreements may conflict with this agreement, this agreement controls." [R. 44-2, 23, ¶ 21]. But there is nothing in the Lease that conflicts with the above-quoted portions of the Lease Clarification Agreement, and ARC fails to identify any portion of the Lease (or any of the various lease agreements) that establishes its ownership of the Coal Handling Facilities. Indeed, the current Lease, at Paragraph 2(a)–(c), mirrors the language of the Lease Clarification Agreement's Paragraph 3(a)–(c), which plainly speaks to a leasehold interest. *Compare* [R. 44-2, pp. 6–9], *with* [R. 178-4, pp. 9–11].

At most, ARC cites Paragraph 16 of the Lease and states, without further explanation, that it "clearly acknowledges [ARC's] ownership of the Coal Handling Facilities." *Id.* at 4. But Paragraph 16 does no such thing.

As noted above, Paragraph 16 states that, upon termination of the Lease,

Lessee shall have the right to enter upon the property covered hereunder and to remove therefrom all equipment, machinery, supplies, tracks, structures, tipples, cleaning plants, washing plants, tanks and other items of personalty and all fixtures *owned by Lessee*, and all mined and stored coal, provided that all sums due and owing to Lessor under the terms hereof shall have been paid.

[R. 44-2, p. 21, ¶ 16 (emphasis added)]. Thus, the plain language of Paragraph 16 only addresses what rights the lessee has to remove property already *owned by the lessee*, upon termination of the Lease. Section 16 clearly contemplates that this property *can* include "equipment, machinery, supplies, tracks, structures, tipples, cleaning plants, washing plants, tanks . . . , other items of personalty, [] all fixtures owned by Lessee, and all mined and stored coal." *Id.* But it provides no insight as to what specific property the lessee owns, nor does it address more specifically what property Perry County Coal owned at the time its interest in the Lease was sold to ARC in the Cambrian Holding Bankruptcy. And nothing in the Lease contains a grant to the lessee of any ownership interest in the improvements or the Coal Handling Facilities that is different or in conflict with the Original Lease or the 1978 Lease Clarification Agreement. Because the terms of the 1981 Lease, including Paragraph 16, do not conflict with the above-quoted provisions of the 1978 Lease Clarification Agreement, those provisions remain in effect. As explained above, the plain language of those provisions in the 1978 Lease Clarification Agreement indicates that Hazard Coal, as the lessor, has always owned the Coal Handling Facilities, and pursuant to the various leases, it leased the exclusive right to use those facilities to the lessee.

Because Perry County Coal held a leasehold interest in the Coal Handling Facilities at the commencement of the bankruptcy proceedings, its bankruptcy estate included that leasehold interest, as already explained. *See* 11 U.S.C. § 541(a)(1). Thus, while the Court need not interpret the Bankruptcy Court's Sale Order to determine ownership, importantly, the Court's analysis is fully consistent with the language of the Sale Order. The Bankruptcy Court's Sale Order not only transferred assets *owned* by Perry County Coal, but it also assigned and transferred Perry County Coal's interest in certain "Assigned Contracts," which included "unexpired leases and executory contracts." [R. 36-6, pp. 2, 6]. As already explained, Perry County Coal's lease interests, as

- 30 -

relevant here, included a lease of the Coal Handling Facilities, which allowed Perry County Coal, as the lessee, "to construct, operate, use and maintain" the Coal Handling Facilities. This *leasehold* interest, which does not include an *ownership* interest, was transferred to ARC in the bankruptcy proceedings.

Indeed, the sale of Perry County Coal's lease interests—including its lease interests pertaining to the Coal Handling Facilities—is reflected in the definition of Purchased Assets cited by ARC:

> The Purchased Assets are *all leases, interests in real property, contracts*, governmental permits and/or authorizations . . . , *improvements*, equipment, parts, and inventory, coal inventory, all deposits (including, but not limited to, insurance and utility deposits), maps, electronic files, records and employee information (to the extent permitted by law) which are (a) necessary and desirable for the operation of the Perry County Operations as such operations would be operated by an experienced and prudent operator, and (b) *owned and leased* by [the sellers, including Perry County Coal] with respect to the Perry County Operations. The Purchased Assets also include any real property, improvements, leases, equipment, parts and inventory and coal inventory located within the Perry County Operations whether or not contained within, on, or under the [mining] permits listed [in the Bill of Sale].

[R. 36-7, p. 65 (Exhibit A to Bill of Sale) (emphasis added)]. To be sure, then, Perry County Coal *did* have an interest in the Coal Handling Facilities and improvements that was then sold to ARC in the bankruptcy proceedings. But that interest was a leasehold interest, just like its interest in the coal seams. The Sale Order no more transferred an ownership interest in the Coal Handling Facilities than it did an ownership interest in the coal seams, or the real property on which the Coal Handling Facilities stand. When ARC breached the Lease by defaulting on its payments, its leasehold interests, or more specifically, "the rights and privileges granted [under the Lease,]" became "null and void and of no further effect." [R. 44-2, p. 20]. Thus, the language in the Sale

Order and its attachments, including the definition of Purchased Assets, do not conflict with the Court's analysis.[8]

For all of the reasons set forth above, the Court finds that Hazard Coal, as the moving party, has met its burden of citing to evidence of record, namely, the various lease agreements, that demonstrates its ownership of the Coal Handling Facilities. ARC does not allege, nor cite to any evidence demonstrating, a material dispute of fact regarding these lease agreements and ownership of the Coal Handling Facilities. Indeed, beyond citing to the Sale Order and briefly pointing to Paragraph 16 (and repeatedly failing to quote that provision's requirement that "all sums due and owing" have first been paid, [R. 44-2, p. 21, ¶ 16]), ARC fails to provide any support for its position that it owns the Coal Handling Facilities, despite having an opportunity to conduct discovery on this issue. *See* [R. 140]. Simply put, then, ARC has failed to satisfy its burden to produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted).

### 4. Additional Considerations

#### a. Extrinsic or Parol Evidence

As previously explained, in interpreting a contract, the Court "must begin with an examination of the plain language of the instrument." *Kentucky Shakespeare Festival*, 490 S.W.3d at 694. If a contract is unambiguous, it will be enforced strictly according to its terms, without resort to extrinsic evidence. *Frear*, 103 S.W.3d at 106; *Stinler*, 2023 WL 8656204, at *3. Under limited circumstances, however, a court can consider extrinsic or parol evidence. For example,

---

[8] For the same reasons, there are no preclusion concerns, and regardless, ARC's arguments regarding claim or issue preclusion are wholly undeveloped and need not be considered further. *See McPherson*, 125 F.3d at 995–96.

"[w]here a contract is ambiguous or silent on a vital matter, a court may consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties." *Cantrell Supply Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. App. 2002) (citations omitted).

However, if the contract is ambiguous and there are material disputes concerning the extrinsic evidence, these factual issues are "subject to resolution by the fact-finder." *Id.* For example, where a deed granting an easement and allowing for the construction of a road was silent as to the type of road (dirt, gravel, paved, etc.), but the evidence of the parties' intentions conflicted, a Kentucky court found that "these factual issues [are] better left to the fact-finder." *Logan v. Collins*, No. 2022-CA-0731-MR, 2023 WL 6766116, at *6 (Ky. Ct. App. Oct. 13, 2023).

In the present case, neither party argues that an ambiguity exists in any of the various lease agreements, such that the Court should consider extrinsic or parol evidence. Nor does the Court believe that the lease agreements contain such an ambiguity. An ambiguity exists "if a reasonable person would find [the contract] susceptible to different or inconsistent interpretations." *Hazard Coal Corporation v. Knight*, 325 S.W.3d 290, 298 (Ky. 2010) (quoting *Cantrell Supply Inc.*, 94 S.W.3d at 385); *Central Bank & Trust Co. v. Kincaid,* Ky., 617 S.W.2d 32, 33 (1981) ("An ambiguous contract is one capable of more than one different, reasonable interpretation."). Here, the parties do not identify, and the Court has not located, any term or provision of the various lease documents to be capable of more than one different and reasonable interpretation. *See generally Davis v. Siemens Medical Solutions USA, Inc.*, 399 F. Supp. 2d 785, 793 (W.D. Ky. 2005) (explaining that the ambiguity must be apparent on the face of the contract (citing *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000)).

Indeed, in a similar case in which a lease agreement failed to address ownership of certain items, the Court of Appeals of Kentucky found no ambiguity. In that case, *Stinler, Inc. v. Mall Road Investors, Ltd. Co*, a lease agreement specified that the landlord was required to install an HVAC unit, and the tenant was required to maintain and repair the unit. 2023 WL 8656204 at *3. The lease was silent as to ownership of the HVAC, however. *Id.* Approximately two years into the lease, the tenant paid for and installed a new HVAC unit. *Id.* When the lease ended, the tenant claimed that it owned the HVAC unit. *Id.* Both the trial and appellate courts disagreed, noting that "[t]here is no ambiguity in the lease regarding the HVAC," and it "does not convey ownership of the HVAC to the tenant." *Id.* Similarly, in this case, there is no ambiguity in the lease documents regarding *ownership* of the Coal Handling Facilities.

At best, the Lease and its various supplements, including the 1978 Lease Clarification Agreement, may be *silent* on the issue of ownership of the Coal Handling Facilities. In such cases, the Court may consider extrinsic or parol evidence, as already noted. *See Cantrell Supply Inc.*, 94 S.W.3d at 385 ("Where a contract is ambiguous or silent on a vital matter, a court may consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties."). Even so, the Court's consideration of extrinsic evidence, and more specifically, parol evidence— i.e., evidence or oral or written statements made prior to or contemporaneous with the contract— is limited. *See In re Bailey*, 665 B.R. 297, 317 (Bankr. E.D. Ky. 2024) (discussing limitations of parol evidence, for instance, parol evidence's inability to "vary a writing," or its ability to "add terms to an incomplete agreement" but only when the agreement is partially integrated).

Regardless, even "if a reasonable person would find [the various lease agreements] susceptible to different or inconsistent interpretations," *Hazard Coal Corporation*, 325 S.W.3d at

298 (quoting *Cantrell Supply Inc.*, 94 S.W.3d at 385), or find that they were silent on the issue of ownership of the Coal Handling Facilities, the extrinsic evidence of record still supports Hazard Coal's ownership of those facilities. Specifically, the Jack E. Whitaker affidavit[9] explains "the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties." *Cantrell Supply Inc.*, 94 S.W.3d at 385; *see also* [R. 156-25 (Jack E. Whitaker Affidavit)]. Mr. Whitaker's affidavit also speaks clearly on the contracting parties' intent: "Both Whitaker Coal and Hazard Coal intended for the Coal Handling Facilities to be permanent structures on Hazard Coal's property and for the Coal Handling Facilities to be owned by Hazard Coal." [R. 156-25, ¶ 42]. ARC does not dispute this statement, nor provide or cite to any evidence of record that would conflict with Mr. Whitaker's statements, despite ample opportunity to conduct discovery on this issue. [R. 140]. As such, the extrinsic evidence of record is undisputed, such that the Court could resolve the issue. *See Cantrell Supply Inc.*, 94 S.W.3d at 385; *Logan*, 2023 WL 6766116, at *6. Based on that undisputed evidence, the Court finds that, even if the lease documents contained an ambiguity or were silent on the issue of ownership of the Coal Handling Facilities, the evidence of record indicates that the parties intended for Hazard Coal to own the Coal Handling Facilities. *See* [R. 156-25, ¶ 42]. And for all of the reasons already explained, that evidence and the parties' intent is wholly consistent with the language used in the various lease documents.

### b. Fixtures

Moreover, the Court's analysis is further supported by basic principles of property law and fixtures. *See generally Stinler, Inc.*, 2023 WL 8656204, at *3–4 (applying trade fixtures test to

---

[9] Notably, Jack Whitaker's affidavit explains that both he and Elmer Whitaker were affiliated with both the lessor and lessee at the time of the lease agreements. [R. 165-25, ¶¶ 3–12]. Thus, Jack Whitaker has personal knowledge of both the lessee *and* lessor's intentions in drafting these various agreements.

determine ownership of certain fixtures that were not expressly referenced in the lease agreement).

In considering those principles, the Court applies the substantive law of Kentucky. *Hayes*, 266

F.3d at 566. As Kentucky courts have explained,

> "[a] fixture is an article in the nature of personalty, which has been so annexed or affixed to realty that it is regarded for legal purposes as part of the realty, loses its separate existence, partakes of the legal incidents of the freehold, and belongs to the person owning the land."

*Southern Industrial, LLC v. Maxine, LLC*, No. 2008-CA-002311-MR, 2009 WL 4060698, *2 (Ky.

Ct. App. Nov. 25, 2009) (quoting 36 C.J.S. Fixtures § 1); *see also Scott v. Garard County Fiscal

Court*, No. 5:08-cv-273, 2012 WL 1135929, *2 (E.D. Ky. Apr. 4, 2012) ("Under Kentucky law,

fixtures are considered part of the realty to which they are attached and, thus, they are subject to

the same rights as the real property itself." (citing *Southern Industrial*, 2009 WL 4060698, at *2)).

If an article qualifies as a fixture, it is typically "considered a part of the real property to which it

is attached." *Scanlon v. Scanlon*, 545 S.W.3d 311, 315 (Ky. Ct. App. 2018) (citing *Bank of

Shelbyville v. Hartford*, 104 S.W.2d 217, 219 (Ky. 1937)).

Importantly, ARC does not dispute that the Coal Handling Facilities are fixtures that should

be considered part of the real property to which they are attached. [R. 165, p. 6 (arguing that

whether the Coal Handling Facilities are improvements or fixtures is irrelevant to the ownership

issue, and failing to address the merits of Hazard Coal's fixtures argument)]. Given ARC's failure

to respond to the merits of this argument, the Court could consider that argument waived. *See

generally Smith v. Flinkfelt*, No. 13-02-GFVT, 2014 WL 1331182, at *4 (E.D. Ky. Mar. 31, 2014)

(collecting cases holding that a plaintiff abandons a claim where it fails to property respond to a

motion for summary judgment); *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)

("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed

argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument

in the most skeletal way, leaving the court to put flesh on its bones.") (cleaned up). Regardless, application of Kentucky's substantive law on fixtures demonstrates that the Coal Handling Facilities are, indeed, fixtures.

Typically, Kentucky courts apply a three-part test to determine if an article is a fixture. *Southern Industrial*, 2009 WL 4060698, at *2; *see also Scanlon v. Scanlon*, 545 S.W.3d 311, 315 (Ky. Ct. App. 2018) (referring to the three elements as three "tests"). First, courts consider the article's "annexation to realty, either actual or constructive." *Scanlon*, 545 S.W.3d at 315 (quoting *Tarter v. Turpin*, 291 S.W.2d 547, 548 (Ky. 1956)) (internal quotation marks omitted). Second, they consider "adaptation or application to the use or purpose that the part of the realty to which [the article] is connected is appropriated." *Id.* (quoting *Tarter*, 291 S.W.2d at 548) (internal quotation marks omitted). And third, courts consider "the intention of the parties to make the article a permanent accession to freehold." *Id.* (quoting *Tarter*, 291 S.W.2d at 548) (internal quotation marks omitted). This third element—the intention of the parties—is the controlling factor. *Id.* (citation omitted).

First, the Court considers the Coal Handling Facilities' "annexation to realty, either actual or constructive." *Scanlon*, 545 S.W.3d at 315 (quoting *Tarter*, 291 S.W.2d at 548) (internal quotation marks omitted). Actual annexation to real property "occurs when an item is physically attached to the real property, such that it could not be removed without considerable force or damage to the item or the real property." *Id.* (citation omitted). Constructive annexation, on the other hand, "occurs 'when a particular article, although not permanently attached to realty, is so adapted to the use to which the realty is put that it may be considered an integral part of the realty,'" or when "'removal leaves the personal property unfit for use so that it would not of itself and

standing alone be well adapted for general use elsewhere.'" *Id.* at 315–16 (quoting 36A C.J.S Fixtures § 14 (2017)); *see also Southern Industrial*, 2009 WL 4060698, at *2 (citations omitted).

Here, as explained in Jack E. Whitaker's affidavit and as seen in the pictures and videos submitted by Hazard Coal, the Coal Handling Facilities, many of which are several stories tall, were affixed to the land by being welded onto a foundation, bolted into concrete bases or foundations, or set in concrete bases or foundations. *See* [R. 156-2, ¶¶ 39–40]; [R. 159].[10] While ARC argues that the structures can be removed and reconstructed at other mining sites, *see* [R. 165, p. 9], ARC has presented no evidence that any parts of the Coal Handling Facility could be easily removed from the property without significant damage to the structures or the real property. *Cf. Southern Industrial*, 2009 WL 4060698, at *5 (finding first element failed where "*the evidence demonstrates* that these silos can be unbolted and removed from the property on which they are situated without significant damage to themselves or the real property") (emphasis added). Indeed, the structures were not constructed elsewhere and transported to the property, such they might again be easily transported *from* the property; rather, they were fabricated and constructed on site. [R. 156-25, ¶ 38]; *cf. Southern Industrial*, 2009 WL 4060698, at *2 (finding that the structures at issue could be easily removed and transported, and noting that they had been transported onto the property). Thus, this annexation element weighs heavily in favor of a finding that the Coal Handling Facilities are fixtures.[11]

---

[10] Hazard Coal filed a flash drive containing the various photo and video exhibits. [R. 159]. These exhibits include those photos and videos at R. 156-9 through R. 156-21.

[11] "As a caveat, however, this element is generally given little weight." *Southern Industrial*, 2009 WL 4060698, at *3. Instead, as explained below, this element "is merely a factor to be considered in determining the 'controlling' third element: the intention of the owner in the item's use." *Id.* (quoting *Doll v. Guthrie*, 24 S.W.2d 947, 948 (1929)). Regardless, in this case, all three elements weigh in favor of finding that the Coal Handling Facilities are fixtures.

Next, the Court considers the adaptation of the Coal Handling Facilities, that is, whether the facilities were "adapted or applied to the use or purpose of the property to which it is connected." *Scanlon*, 545 S.W.3d at 316 (citation omitted). An object is adapted to the use of the real property "'when the object and the real property are united in the carrying out of a common enterprise.'" *Id.* (quoting 36A C.J.S Fixtures § 14). And in Kentucky, "[i]t has been said that an article loses its status as simple unrelated personalty and becomes a fixture when it becomes so integrated into the efficient use of the particular parcel of real estate that it has become logically considered more a part of real estate than not." *Southern Industrial*, 2009 WL 40602698, at *3 (quoting 35A Am.Jur.2d Fixtures § 11 (2009)).

Here, there is little question that the Coal Handling Facilities, which include coal processing/washing, storage, loadout and related facilities, [R. 156-25, ¶ 30], are "adapted or applied to the use or purpose of the" real property to which they are connected. The undisputed evidence of record indicates that the Coal Handling Facilities were specifically designed to accommodate the large capacity of coal holdings unique to the Hazard Coal property. *Id.* ¶¶ 45, 46, 47. As explained in Jack E. Whitaker's affidavit, the Coal Handling Facilities were "uniquely designed/constructed to accommodate" Hazard Coal's "extensive coal holdings, *id.* ¶ 46, thereby allowing the coal mined from the property to be "processed/washed, handled, stored, blended and loaded" without needing to be transported to other locations, which in turn saved handling/transportation costs and provide efficiency. ¶ 47. Indeed, one of the core requirements of the lease agreements was for the lessee to maintain a strictly modern plant. *See* [R. 156-2, p. 2]. Pursuant to that requirement, the lessee is later given the right to construct the new Coal Handling Facilities, with the exclusive right to use them. [R. 178-4, p. 9, ¶ 3(c)]. This further demonstrates the parties' intent in designing and building the Coal Handling Facilities for this unique purpose,

as well as the paramount importance of these structures in continuing to operate a modern coal mine. *See* [R. 156-25 (explaining that Jack Whitaker and others began "investigating the cost and nature of facilities that would be needed" to respond to "more stringent environmental regulation" and a "rise in railroad freight rates)]. In addition, the pictures and videos in the record show that these structures are uniquely designed to accommodate the core purpose of the real property—use as a coal mine. *See* [R. 159]. Simply put, these are not generic structures that could be adapted for a wide variety of uses.

ARC offers no evidence or argument in response, beyond vaguely arguing that the Coal Handling Facilities have value because they "could sell the Coal Handling Facilities to another entity who could come on the property and dismantle and remove the facilities for reconstruction at another site." [R.165, p. 9]; *cf. Southern Industrial*, 2009 WL 40602698, at *5 (explaining that the articles at issue, silos, failed to meet the second element where they were "not particularly adapted to [the real] property" and could be "usable at another location"). But again, ARC offers no evidence to support this statement. And importantly, ARC effectively concedes that the Coal Handling Facilities are essential and uniquely adapted to the real property. In its Motion to Refer, ARC, parroting the definition of "Purchased Assets," argues that the Coal Handling Facilities are "'improvements', 'equipment' and/or *are necessary and desirable for the operation of the Perry County Operation* as such operations would be operated by an experienced and prudent operator.'" [R. 164-1, p. 2 (emphasis added) (quoting the Bill of Sale, R. 36-7, pp. 58–64)]. Then, in response to Hazard Coal's summary judgment motion, ARC repeats this quote and argues, "Without being able to wash/process raw coal mined from the leasehold and being able to load clean coal onto trains at the loading facility, [ARC] nor any other prudent operator would be able to effectively and efficiently operate the mine and associated facilities." [R. 165, p. 5].

- 40 -

Moreover, as already explained, the evidence of record is clear that the Coal Handling Facilities were uniquely designed and constructed to accommodate the unique and extensive coal holdings on the Hazard Coal property, and they have become "so integrated into the efficient use of [that] particular parcel of real estate that it has become logically considered more a part of real estate than not." *Southern Industrial*, 2009 WL 40602698, at *3 (quoting 35A Am.Jur.2d Fixtures § 11 (2009)). Thus, the adaptation element weighs in favor of a finding that the Coal Handling Facilities are fixtures.

Finally, the Court considers "the intention of the parties to make the article a permanent accession to freehold." *Scanlon*, 545 S.W.3d at 315 (quoting *Tarter*, 291 S.W.2d at 548) (internal quotation marks omitted). The parties' "intention to make an article a permanent accession to the realty must affirmatively and plainly appear, and if the matter is left in doubt and uncertainty the legal qualities of the article are not changed, and it must be deemed a chattel." *Id.* at 316 (quoting *Doll*, 24 S.W.2d at 948) (internal quotation marks omitted). However, "the test of intention is to be given a broad and comprehensive signification." *Southern Industrial*, 2009 WL 4060698, at *4 (quoting *Doll*, 24 S.W.2d at 948). As Kentucky courts have explained,

> It does not merely imply the secret action of the mind of the owner of the property, nor need it be expressed in words, but is to be inferred from the nature of the article affixed, the relation and situation of the party making the annexation, the structure and mode of annexation, and the purpose or use for which the annexation has been made.

*Id.* (quoting *Doll*, 24 S.W.2d at 948).

This suggests that "[t]he first two [elements]—annexation and adaption—are used in determining a party's intention." *Scanlon*, 545 S.W.3d at 316 (citing *Doll*, 24 S.W.2d at 948). In other words, "the other [elements] are really part of this comprehensive test of intention, and [] they derive their chief value as conspicuous evidence of such intention." *Id.* at 317 (quoting *Doll*,

- 41 -

24 S.W.2d at 948) (internal quotation marks omitted).  Thus, if the article at issue has "a special adaptation to the use to which the freehold is being applied, and its removal would seriously impair its value, then such an intention may fairly be inferred as to constructively connect it with the freehold, and the business for which it is being used." *Id.* at 316 (quoting *Doll*, 24 S.W.2d at 948) (internal quotation marks omitted). Importantly, this third element regarding the parties' intention "is held to be the chief test." *Id.* at 316 (quoting *Doll*, 24 S.W.2d at 948) (internal quotation marks omitted). Indeed, it "is determinative in cases where there is any doubt as to whether an item is, or is not, a fixture." *Southern Industrial*, 2009 WL 4060698, *3.

Here, the Jack Whitaker affidavit clearly states that "[b]oth Whitaker Coal and Hazard Coal intended for the Coal Handling Facilities to be permanent structures on Hazard Coal's property and for the Coal Handling Facilities to be owned by Hazard Coal."[12] [R. 156-25, ¶ 42]. The understanding is reflected in the language of the Lease and its various supplements, which as already explained, provide to the lessee only a leasehold interest in the various improvements on the property. ARC does not dispute the statements made in Jack E. Whitaker's affidavit, nor offer any evidence to counter it.

Moreover, the parties' intentions are further reflected in the Court's discussion of the annexation and adaptation elements above. *See Scanlon*, 545 S.W.3d at 317 (explaining that the annexation and adaptation elements "are really part of this comprehensive test of intention, and [] they derive their chief value as conspicuous evidence of such intention." *Id.* (quoting *Doll*, 24 S.W.2d at 948)) (internal quotation marks omitted). As already explained, one of the core requirements under the lease agreements was for the lessee to maintain a strictly modern plant, and later, pursuant to that requirement, the lessee is given the right to construct the new Coal

---

[12] As already explained, Jack Whitaker has personal knowledge of both the lessee *and* lessor's intentions in drafting these various agreements. [R. 165-25, ¶¶ 3–12].

Handling Facilities, with the exclusive right to use them. *See* [R. 156-2, p. 2]; [R. 178-4, p. 9, ¶ 3(c)]. This further demonstrates the parties' intent in designing and building the Coal Handling Facilities for this unique purpose. *See* [R. 156-25 (explaining that Jack Whitaker and others began "investigating the cost and nature of facilities that would be needed" to respond to "more stringent environmental regulation" and a "rise in railroad freight rates)]. In addition to the language in the various lease documents, which provides clear insight into the parties' intentions, the pictures and videos in the record show that these structures are uniquely designed to accommodate the core purpose of the real property—use as a coal mine. *See* [R. 159].

Again, ARC does not dispute the statements made in Jack E. Whitaker's affidavit, nor offer any evidence to counter it. And ARC effectively concedes that the Coal Handling Facilities are essential and uniquely adapted to the real property upon which they stand. *See* [R. 164-1, p. 2]; [R. 165, p. 3]. Indeed, as already noted, ARC does not dispute that the Coal Handling Facilities are fixtures. Thus, based on the undisputed evidence of record, the parties' intention was to make the Coal Handling Facilities "a permanent accession to the freehold." *Scanlon*, 545 S.W.3d at 315 (quoting *Tarter*, 291 S.W.2d at 548) (internal quotation marks omitted). All three tests therefore strongly support the conclusion that the Coal Handling Facilities are fixtures that remain part of the real property, rather than personal property.

The Court further notes that ARC does not provide any developed argument that the Coal Handling Facilities are trade fixtures. *See generally* [R. 165]. A trade fixture is "property which a tenant has placed on rented real estate to advance the business for which it is leased." *Scanlon*, 545 S.W.3d at 315 (quoting *Bank of Shelbyville*, 104 S.W.2d at 218–19) (internal quotation marks omitted). Such "[t]rade fixtures are distinguished from 'ordinary' fixtures" in that they "are considered personal property and may be removed when vacating real property." *Id.* (citing *Bank*

*of Shelbyville*, 104 S.W.2d at 219. But again, ARC makes no developed argument on this issue, and as already noted, ARC does not dispute that the Coal Handling Facilities are ordinary fixtures. Thus, even if the Court were to resort to basic principles of property law, it would find that the Coal Handling Facilities are fixtures that are part of the real estate and are therefore owned by Hazard Coal.

As the Court has already explained, it can resolve the fixtures issue without resort to Hazard Coal's expert reports. The Court has viewed the pictures and videos of the Coal Handling Facilities provided by Hazard Coal, [R. 159], and reviewed the terms of the various lease agreements and supplements, and it has conducted numerous status conferences (dating back to the two 2020 motions for temporary restraining order), as well as more recent hearings where the Court became familiar with the Coal Handling Facilities. *See, e.g.*, [R. 137]. Based on the record before the Court, the question of whether the Coal Handling Facilities qualify as fixtures is an easy one. It is abundantly clear from the evidence of record, exclusive of the expert reports, that each element of Kentucky's three-part test weighs heavily in favor of finding that the Coal Handling Facilities are fixtures.

Lastly, the Court notes that, even if the Court were to assume ARC owned the Coal Handling Facilities during its tenure as the lessee (as ARC argues), its right to remove those facilities after termination of the Lease is limited. Under the plain language of Paragraph 16, ARC may only enter the property and remove what it owns if "all sums due and owing to Lessor under the terms hereof shall have been paid." [R. 44-2, p. 21, ¶ 16]. As this Court has already explained, ARC breached the Lease in 2020 by failing to pay the 2019 annual minimum royalties. [R. 81]. ARC does not contend that it has paid those past-due royalties to Hazard Coal. To be sure, ARC appears to concede that it has not paid "all sums due and owing," such that it would be entitled to

remove the Coal Handling Facilities if it owned them. For example, ARC insists that Paragraph 16 "does not say that if all sums have not been paid, ownership of the items would then transfer to the Lessor," and instead, Paragraph 16 "only precludes the Lessee from removing items that it owns until those sums have been paid." [R. 165, p. 7]. From this, the Court understands that ARC admits its failure to pay, or offer to pay, "all sums due and owing" to Hazard Coal. Instead, ARC appears to argue that, assuming it owns the Coal Handling Facilities, it is still entitled to make such an offer, thereby triggering its right to remove the those facilities, over five years after the Lease terminated. ARC cites to no law or authority to support this position. Regardless, for all of the reasons already explained, the Court finds that Hazard Coal owns, and has owned, the Coal Handling Facilities.

### III. CONCLUSION

For the reason set forth above, **IT IS HEREBY ORDERED** as follows:

1. ARC's Motion to Strike Testimony of Plaintiff's Proposed Expert Witness Edward Harris Greenwald, Jr., [**R. 154**], is **DENIED as moot**.

2. ARC's Motion to Strike Testimony of Plaintiff's Proposed Expert Witness James Steven Gardner, [**R. 155**], is **DENIED as moot**.

3. ARC's Motion to Join Continental Heritage Insurance Company to This Action in Order to Respond to the Plaintiff's Motion for Summary Judgment, Pursuant to Federal Rule of Civil Procedure 19(A), [**R. 162**], is **DENIED**.

4. ARC's Motion to Join the Liquidating Trustee of the Cambrian Liquidating Trust to This Action in Order to Respond to the Plaintiff's Motion for Summary Judgment, Pursuant to Federal Rule of Civil Procedure 19(A), [**R. 163**], is **DENIED**.

5.  ARC's Motion to Refer Plaintiff's Motion for Summary Judgment Regarding the Ownership of the Coal Handling Facilities to the US Bankruptcy Court for Resolution Pursuant to the Bankriptcy (sic) Court's Sale Order, [**R. 164**], is **DENIED**.

6.  ARC's Motion to Supplemnt (sic) the Record Relating to the Plaintiff's Motion for Summary Judgment Regarding the Ownership of the Coal Handling Facilities, [**R. 174**], is **DENIED**.

7.  Hazard Coal's Motion for Summary Judgment Declaring that Hazard Coal is the Owner of the Coal Handling Facilities, [**R. 156**], is **GRANTED**.

This the 6th day of January, 2026.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY